814 F.2d 697
 124 L.R.R.M. (BNA) 2993, 259 U.S.App.D.C.
168, 55 USLW 2530,
106 Lab.Cas. P 12,256
 INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION
NO. 474, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
St. Francis Hospital, Inc., Intervenor.
 No. 85-1642.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 23, 1986.
Decided March 20, 1987.
 
 Petition for Review of an Order of the National Labor relations board.
 Allen S. Blair, with whom James R. Newsom, III, Memphis, Tenn., Laurence J. Cohen, David M. Silberman and Laurence Gold, Washington, D.C., were on brief, for petitioner.
 Victoria A. Higman, Atty., N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on brief, for respondent.
 
 
 1
 James V. Coggin, Jr., Memphis, Tenn., was on brief, for intervenor, St. Francis Hosp.
 
 
 2
 George Kaufmann, Washington, D.C., was on brief, for amicus curiae, American Nurses' Ass'n, urging remand to the N.L.R.B.
 
 
 3
 Bruce P. Saypol, Washington, D.C., was on brief, for amicus curiae, American Hosp. Ass'n, urging the denial of the petition for review.
 
 
 4
 Before EDWARDS and BUCKLEY, Circuit Judges, and JOYCE HENS GREEN,* District Judge of the United States District Court for the District of Columbia.
 
 
 5
 Opinion for the Court filed by Circuit Judge EDWARDS.
 
 
 6
 Concurring opinion filed by Circuit Judge BUCKLEY.
 
 HARRY T. EDWARDS, Circuit Judge:
 I. INTRODUCTION
 
 7
 This petition for review challenges a dismissal by the National Labor Relations Board ("Board") of an unfair labor practice complaint charging the intervenor, St. Francis Hospital (the "Hospital"), with an unlawful refusal to bargain. St. Francis Hosp., 271 N.L.R.B. 948 (1984) ("St. Francis II "). In a prior decision, St. Francis Hospital, 265 N.L.R.B. 1025 (1982) ("St. Francis I" ), the Board upheld a Regional Director's designation of a bargaining unit of the Hospital's maintenance personnel. Shortly thereafter, the maintenance employees elected the petitioner, International Brotherhood of Electrical Workers, Local Union No. 474 ("IBEW" or the "Union"), as their bargaining representative.[1] The Hospital refused to bargain with the Union, however, maintaining that the maintenance unit was inappropriate. The Hospital argued that when Congress amended the National Labor Relations Act (the "Act" or "NLRA") in 1974 (the "1974 Amendments")[2] to cover nonprofit health-care employees, Congress had precluded the Board from determining appropriate bargaining units in nonprofit health-care institutions under traditional "community-of-interest" principles.[3] The General Counsel for the Board issued an unfair labor practice complaint against the Hospital and moved for summary judgment.[4]
 
 
 8
 In the decision we review today, St. Francis II, 271 N.L.R.B. 948 (1984), the Board has reconsidered its initial designation of the maintenance unit. The Board has now concluded that the 1974 Amendments to the Act require it to apply a standard stricter than the traditional community-of-interest criteria when determining appropriate bargaining units in nonprofit health-care institutions. Specifically, the Board's latest decision holds that the 1974 Amendments mandate a "disparity-of-interest" standard. Thus, the Board now apparently presumes that there are only two appropriate units in the health-care industry (professional and nonprofessional), see note 25 infra, and it requires "sharper than usual differences (or 'disparities') between the wages, hours, and working conditions, etc., of the requested employees and those in the overall professional or nonprofessional unit" in order to certify a unit other than one presumed to be valid. 271 N.L.R.B. at 953. Under this revised legal standard, the Board dismissed the unfair labor practice complaint against the Hospital, finding that the maintenance unit did not possess the requisite disparity-of-interest to justify separate representation.[5]
 
 
 9
 Under section 9 of the Act,[6] the Board possesses broad discretion to determine employee units appropriate for the purposes of collective bargaining.[7] This court cannot, however, sustain a unit determination by the Board "where it is based not on the agency's own judgment but on an erroneous view of the law." Prill v. NLRB, 755 F.2d 941, 947 (D.C.Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985); see SEC v. Chenery Corp., 318 U.S. 80, 94-95, 63 S.Ct. 454, 462-63, 87 L.Ed. 626 (1942). We believe that in St. Francis II the Board failed to exercise its discretion under section 9 and instead rested its decision on a faulty legal premise. The Board ignored fundamental principles of statutory interpretation when it found that the 1974 Amendments to the Act mandate the disparity-of-interest standard. While the House and the Senate Committee Reports and statements by individual legislators express some concern over proliferation of bargaining units in health-care institutions, Congress, in the final analysis, decided against modifying section 9 of the Act.[8] Although legislative history may give meaning to ambiguous statutory provisions, courts have no authority to enforce alleged principles gleaned solely from legislative history that has no statutory reference point.[9] Accordingly, we remand this case under the principles of SEC v. Chenery, as applied to the Board in our recent decision in Prill v. NLRB. We express no opinion on the proper outcome of this case; we merely find that the Board failed to exercise the discretion granted to it by Congress under section 9 and instead rested its decision on a fundamental misinterpretation of the 1974 Amendments to the Act.
 
 II. BACKGROUND
 
 10
 A. Legislative History of the 1974 Amendments to the Act
 
 
 11
 Section 7 of the Act provides that "[e]mployees shall have the right to self-organization, to form, join or assist labor organizations [and] to bargain collectively...." 29 U.S.C. Sec. 157 (1982). Under the Act, one way for a union to gain recognition for purposes of collective bargaining is to petition the Board for a certification election among employees in an appropriate bargaining unit. NLRA Sec. 9, 29 U.S.C. Sec. 159 (1982). The Act sets forth relatively few standards to guide the Board in its certification of collective bargaining units, and therefore in this area the Board possesses broad discretion. Allied Chemical & Alkali Workers, Local No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 171-72, 92 S.Ct. 383, 393-94, 30 L.Ed.2d 341 (1971). The Board must determine whether an "employer unit, craft unit, plant unit, or subdivision thereof" constitutes an "appropriate" employee unit for collective bargaining.[10] NLRA Sec. 9(b), 29 U.S.C. Sec. 159(b) (1982). Section 9(b) defines a "unit appropriate for the purposes of collective bargaining" as one which "assure[s] to employees the fullest freedom in exercising the rights guaranteed by ... [the] Act." Id. In certifying a bargaining unit, however, the Board shall not find controlling "the extent to which the employees have organized." NLRA Sec. 9(c)(5), 29 U.S.C. Sec. 159(c)(5) (1982). In enforcing the Act--except in special cases (for example, involving "professional" employees)--the Board has consistently adhered to a community-of-interest test in defining appropriate units for collective bargaining. See, e.g., American Cyanamid Co., 131 N.L.R.B. 909, 910 (1961). Under this test, the Board has followed a long-standing policy of holding "that 'employees with similar interests shall be placed in the same bargaining unit.' This factor of mutuality of interest, together with the history of collective bargaining in the particular plant or industry involved, is given great weight by the Board in deciding any unit controversy...." 1948 NLRB Ann.Rep. 36 (1949) (citing In re Chrysler Corp., 76 N.L.R.B. 55, 58-59 (1948)). See note 15 infra.
 
 
 12
 In 1974, Congress amended the Act to cover nonprofit health-care institutions.[11] Act of July 26, 1974, Pub.L. No. 93-360, 88 Stat. 395. The 1974 Amendments
 
 
 13
 reflected Congress' judgment that hospital care would be improved by extending the protection of the Act to nonprofit health-care employees. Congress found that wages were low and working conditions poor in the health-care industry, and that as a result, employee morale was low and employment turnover high. Congress determined that the extension of organizational and collective-bargaining rights would ameliorate these conditions and elevate the standard of patient care.
 
 
 14
 Beth Israel Hosp. v. NLRB, 437 U.S. 483, 497-98, 98 S.Ct. 2463, 2471-72, 57 L.Ed.2d 370 (1978) (footnotes omitted).
 
 
 15
 In extending the Act to nonprofit health-care employees, Congress recognized the potential for interruptions in patient care. It therefore enacted special provisions that lengthen the strike notice period and require federal mediation. NLRA Sec. 8(d)(A)-(C), (g), 29 U.S.C. Sec. 158(d)(A)-(C), (g) (1982).[12] Congress, however, did not adopt a provision proposed by Senator Taft which would have limited the number of bargaining units in nonprofit health-care institutions to four (professional, technical, clerical, and service and maintenance) unless the employer and the union agreed otherwise. S. 2292, 93d Cong., 1st Sess. (1973), reprinted in SEN. SUBCOMM. ON LABOR, COMM. ON LABOR & PUBLIC WELFARE, 93d CONG., 2d SESS., LEGISLATIVE HISTORY OF THE COVERAGE OF NONPROFIT HOSPITALS UNDER THE NATIONAL LABOR RELATIONS ACT at 457-58 [hereinafter "LEGISLATIVE HISTORY"]. In fact, Congress did not in any way modify the section of the Act which covers bargaining units--section 9, 29 U.S.C. Sec. 159 (1982). Instead, both the House and the Senate Committee Reports contain language "agreed upon" by supporters and opponents of the Taft provision.[13] This legislative history reads as follows:
 
 EFFECT ON EXISTING LAW
 Bargaining Units
 
 16
 Due consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry. In this connection, the committee notes with approval the recent Board decisions in Four Seasons Nursing Center, 208 NLRB No. 50, 85 LRRM 1093 (1974), and Woodland Park Hospital, 205 NLRB No. 144, 84 LRRM 1075 (1973), as well as the trend towards broader units enunciated in Extendicare of West Virginia, 203 NLRB No. 170, 83 LRRM 1242 (1973).[1]
 
 
 17
 1. By our reference to Extendicare, we do not necessarily approve all of the holdings of that decision.
 
 
 18
 S.REP. NO. 766, 93d Cong., 2d Sess. 5 (1974), reprinted in LEGISLATIVE HISTORY at 12; H.R.REP. NO. 1051, 93d Cong., 2d Sess. 6-7 (1974), reprinted in LEGISLATIVE HISTORY at 274-75. Although the aforementioned legislative history indicates that the Board should give "due consideration" "to preventing proliferation of bargaining units in the health care industry," nothing was added to the statute with respect to unit determinations or certification procedures under section 9 of the NLRA. In other words, the same statutory standards that had existed before the enactment of the 1974 Amendments with respect to unit determinations and certification procedures remained in the statute, entirely unmodified, following the passage of the 1974 Amendments.
 
 
 19
 At least one legislator expressed concern that the Committee Reports' language did not rectify the problem of bargaining unit proliferation because it did not, inter alia, modify section 9 of the Act. Senator Dominick voted against reporting the bill out of committee due to "the bill's failure to treat bargaining units...." S.REP. NO. 766, 93d Cong., 2d Sess. 44, U.S.Code Cong. & Admin.News 1974, p. 3958, reprinted in LEGISLATIVE HISTORY at 51. Senator Dominick maintained that "[t]he potential for recognition of numerous bargaining units ... merits specific statutory language. A hospital should be protected by statute from being placed in a position of continual bargaining with different units in order to minimize the threat to patient care." Id. at 45, U.S.Code Cong. & Admin.News 1974, p. 3958, reprinted in LEGISLATIVE HISTORY at 52 (emphasis added).
 
 
 20
 On the other hand, Senator Taft seemed to view the language of the Committee Reports as placing a significant gloss on section 9 of the Act. He remarked that "[w]hile ... [the four bargaining unit] approach was not adopted by the committee, report language was agreed upon to stress the necessity to the Board to reduce and limit the number of bargaining units in a health care institution." 120 CONG.REC. 12,944 (1974) (statement of Sen. Taft), reprinted in LEGISLATIVE HISTORY at 114. Emphasizing that "a definite need [exists] for the Board to examine the public interest in determining appropriate bargaining units," id. at 13,559, reprinted in LEGISLATIVE HISTORY at 255, Senator Taft maintained that "[t]he committee, in recognizing these issues with regard to bargaining unit determination, took a significant step forward in establishing the factor of public interest to be considered by the Board in unit cases." Id. at 12,945, reprinted in LEGISLATIVE HISTORY at 114.
 
 
 21
 Several other legislators also commented on the language of the Committee Reports. As opposed to Senator Taft, however, these other legislators seem to have regarded the language as merely an "admonition" to the Board to recognize the potential for bargaining unit proliferation in the health-care industry. On the same day that the Senate approved the Conference Report,[14] Senator Williams remarked:
 
 
 22
 While the Board has, as a rule, tended to avoid an unnecessary proliferation of collective bargaining units, sometimes circumstances require that there be a number of bargaining units among nonsupervisory employees, particularly where there is such a history in the area or a notable disparity of interests between employees in different job classifications.
 
 
 23
 While the committee clearly intends that the Board give due consideration to its admonition to avoid an undue proliferation of units in the health care industry, it did not within this framework intend to preclude the Board acting in the public interest from exercising its specialized experience and expert knowledge in determining appropriate bargaining units.
 
 
 24
 120 CONG.REC. 22,575 (1974) (statement of Sen. Williams), reprinted in LEGISLATIVE HISTORY at 363. Congressman Thompson observed that while "the committee stressed its concern with preventing an undue proliferation of bargaining units ..., [w]ith these directions, the Board ... should be free to employ its expertise in determining appropriate units." 120 CONG.REC. 22,94 8 (1974) (statement of Rep. Thompson). Similarly, Congressman Ashbrook, in a statement joined by Congressman Thompson, characterized the Committee Reports' language as "stress[ing] the need for the Board to curtail ... [unit] proliferation in health care institutions" and reflecting the "expect[ation] [that] the Board ... [will] be cognizant of the concerns for patient care and employee rights in the Board's continuing review of bargaining unit questions in health care institutions." 120 CONG.REC. 22,949 (1974) (statement of Rep. Ashbrook), reprinted in LEGISLATIVE HISTORY at 411.B. Decisions of the Courts and Board Subsequent to the 1974 Amendments to the Act
 
 
 25
 Contemporaneous with the passage of the 1974 Amendments to the Act, the Board interpreted the Amendments not to preclude it from applying traditional community-of-interest criteria[15] to determine appropriate bargaining units in the health-care industry. In one of its first decisions subsequent to the Amendments, the Board recognized that "the principle thrust of the legislative history of the health care amendments ... admonishes the Board to avoid undue proliferation of bargaining units." Mercy Hosps., 217 N.L.R.B. 765, 766 (1975), enforcement denied in part, 589 F.2d 968 (9th Cir.1978).[16] The Board acknowledged, therefore, that health-care unit certification "must necessarily take place against this background of avoidance of undue proliferation...." Id.; accord Allegheny Gen. Hosp., 239 N.L.R.B. 872, 873 (1978), enforcement denied, 608 F.2d 965 (3d Cir.1979); Jewish Hosp., 223 N.L.R.B. 614, 616 (1976). The Board also observed, however, that Congress had rejected Senator Taft's proposed modification of section 9. According to the Board, nothing in the legislative history indicates anything other than, that by refusing to amend section 9, "Congress, in the final analysis, left the matter of determination of appropriate units to the Board." Id.; see also Allegheny Gen. Hosp., 239 N.L.R.B. at 873 ("If Congress had wanted to preclude the Board from using traditional criteria in making unit determinations in the health care industry, it could have easily amended Section 9(b) to so provide."); Shriners Hosps. for Crippled Children, 217 N.L.R.B. 806, 808 (1975) (the 1974 Amendments "neither foreclosed nor mandated continued adherence to traditional unit determinations").
 
 
 26
 Regarding health-care maintenance employees in particular, the Board emphasized that it had sometimes found maintenance employees in other industries to "possess a community-of-interest separate and distinct from the broader community-of-interest ... to warrant their inclusion in a separate unit."[17] Jewish Hosp., 223 N.L.R.B. at 616. Based on Congress' awareness of these Board decisions and its rejection of the Taft proposal that maintenance employees should always be combined with service employees, the Board concluded that Congress "did nothing to preclude our granting such units." Id. The Board, therefore, sometimes certified bargaining units of hospital maintenance employees subsequent to the 1974 Amendments. See Mary Thompson Hosp., 241 N.L.R.B. 766 (1979) (certifying unit of licensed stationary engineers), enforcement denied, 621 F.2d 858 (7th Cir.1980); Allegheny Gen. Hosp., 239 N.L.R.B. 872 (1978) (certifying unit of maintenance employees), enforcement denied, 608 F.2d 965 (3d Cir.1979); Mercy Hosp. Ass'n, 238 N.L.R.B. 1018 (1978) (certifying unit of maintenance employees), enforcement denied, 606 F.2d 22 (2d Cir.1979), cert. denied, 445 U.S. 791, 100 S.Ct. 1665, 64 L.Ed.2d 248 (1980); Long Island College Hosp., 228 N.L.R.B. 83 (1977) (certifying unit of maintenance workers and engineers), enforcement denied, 566 F.2d 833 (2d Cir.1977), cert. denied, 435 U.S. 996, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978); West Suburban Hosp., 224 N.L.R.B. 1349 (1976) (certifying unit of maintenance employees), enforcement denied, 570 F.2d 213 (7th Cir.1978); Memorial Hosp., 220 N.L.R.B. 402 (1975) (certifying unit of maintenance workers), enforcement denied, 545 F.2d 351 (3d Cir.1976).
 
 
 27
 Frequently, however, circuit courts have refused to enforce Board decisions certifying health-care maintenance units on the ground that the 1974 Amendments do not permit the mere application of traditional community-of-interest criteria. See id. In fact, before our decision today, all of the circuit courts considering this issue have ruled that the 1974 Amendments require the Board explicitly to consider the Committee Reports' admonition against undue proliferation of health-care bargaining units. See, e.g., NLRB v. West Suburban Hosp., 570 F.2d 213, 216 (7th Cir.1978) ("[I]n view of the Board's mere lip-service mention of the Congressional admonition as a factor to be taken into account, without any indication ... as to the manner in which its unit determination ... implemented or reflected that admonition ... the Board's decision violates the Congressional directive...."). The circuit courts have disagreed, however, on what constitutes adequate consideration of the congressional admonition against undue proliferation. The majority of circuit courts have viewed the legislative history of the 1974 Amendments as mandating the Board to balance traditional community-of-interest criteria against the public interest in undue proliferation. E.g., NLRB v. Walker County Medical Center, 722 F.2d 1535, 1538-39 (11th Cir.1984); Trustees of the Masonic Hall & Asylum Fund v. NLRB, 699 F.2d 626, 632-33 (2d Cir.1983); NLRB v. Frederick Memorial Hosp., 691 F.2d 191, 193-94 (4th Cir.1982); Mary Thompson Hosp. v. NLRB, 621 F.2d 858, 864 (7th Cir.1980); Allegheny Gen. Hosp. v. NLRB, 608 F.2d 965, 968-69 (3d Cir.1979); Bay Medical Center v. NLRB, 588 F.2d 1174, 1177-78 (6th Cir.1978), cert. denied, 444 U.S. 827, 100 S.Ct. 53, 62 L.Ed.2d 35 (1979). While these courts have not elaborated on how the Board should strike this balance,[18] they have required the Board clearly to explain the manner in which its unit determination implements the congressional policy of nonproliferation. E.g., Frederick Memorial Hosp., 691 F.2d at 194; West Suburban Hosp., 570 F.2d at 216. The Ninth and Tenth Circuits, on the other hand, have read the legislative history to require a "disparity-of-interest" analysis. E.g., Southwest Community Health Servs. v. NLRB, 726 F.2d 611, 613 (10th Cir.1984); NLRB v. HMO Int'l/Cal. Medical Group Health Plan, Inc., 678 F.2d 806, 808-09 (9th Cir.1982); Presbyterian/St. Luke's Medical Center v. NLRB, 653 F.2d 450, 457 (10th Cir.1981); NLRB v. St. Francis Hosp., 601 F.2d 404, 419 (9th Cir.1979). Under this analysis, the Board must focus on the "disparities," as opposed to the "similarities," "between employee groups which would prohibit or inhibit fair representation of employee interests."[19] Presbyterian/St. Luke's Medical Center, 653 F.2d at 457.
 
 
 28
 C. The Board's Decisions in St. Francis I and St. Francis II
 
 
 29
 On September 28, 1979, the petitioner, IBEW, requested certification of a bargaining unit of maintenance department employees of the intervenor, St. Francis Hospital.[20] The Union's certification petition specifically excluded bio-medical engineers, housekeepers and grounds maintenance men from the bargaining unit.[21] Although the Hospital agreed to the exclusion of bio-medical engineers, it refused to recognize a unit which did not include both service and maintenance employees.[22] Following a hearing, the Regional Director found appropriate a bargaining unit of maintenance personnel at the Hospital. Although the certified unit was slightly broader than the one proposed by the Union, it did not include any service department positions.[23]
 
 
 30
 Before the Board, the Hospital argued that the 1974 Amendments to the Act prohibit the certification of a bargaining unit of only maintenance employees. St. Francis I, 265 N.L.R.B. 1025 (1982). The Board acknowledged that, in finding the maintenance unit appropriate, the Regional Director had relied on Allegheny General Hospital, a decision denied enforcement by the Third Circuit.
 
 
 
 [24]
 The Board, however, characterized "that case [as merely] ... imprecise and, therefore, susceptible to misinterpretation concerning how we reached the conclusion that the maintenance employees there warranted their own bargaining unit." St. Francis I, 265 N.L.R.B. at 1026. The Board, consequently, announced a new two-tier analysis that balances "long-established community-of-interest criteria ... against the legislative concern about over-proliferation of health care bargaining units." Id.
 
 
 
 31
 Under St. Francis I, the Board must first consider whether the proposed unit falls into one of seven "groups of employees commonly found in a health care institution: physicians, registered nurses, other professional employees, technical employees, business office clerical employees, service and maintenance employees and skilled maintenance employees." Id. at 1029. Only if the proposed unit is broad enough to constitute one of these seven groups will the Board then apply "traditional unit principles to determine whether the specific employees involved do, in fact, display the requisite community of interest to warrant separate representation." Id.
 
 
 32
 With respect to the bargaining unit at issue, the Board observed in St. Francis I that the Hospital's maintenance employees "possess overall greater skills and experience than are required for the service employees." Id. at 1034. Concluding that the unit constituted a group of "skilled maintenance employees," the Board then applied a traditional community-of-interest analysis. It noted that
 
 
 33
 [t]he maintenance employees in this case ... report to separate locations at the beginning of their work shifts, are administered separately from the service department, [and] are separately supervised.... They share no duties with the service departments. They are responsible for a variety of maintenance-related functions without being functionally integrated with other hospital departments.
 
 
 34
 Id. The Board upheld the Regional Director's unit determination and ordered an election. Id.
 
 
 35
 Both Chairman Van de Water and Member Hunter dissented. They rejected the majority's two-tier analysis, contending that the legislative history of the 1974 Amendments mandates a "disparity-of-interest" standard. Id. at 1040 (Van de Water, dissenting); id. at 1046-47 (Hunter, dissenting). Under this standard, two presumptively appropriate health-care bargaining units exist--professionals and nonprofessionals. "[O]nly where it is clearly established that the employees in the proposed unit have a notable disparity of interests from employees in the larger unit which would prohibit or inhibit fair representation ... if they were denied separate representation" would a more limited unit be appropriate. Id. at 1040 (Van de Water, dissenting); accord id. at 1047 (Hunter, dissenting).[25] Both Chairman Van de Water and Member Hunter concluded that the Hospital's maintenance employees did not have interests sufficiently disparate from the other nonprofessionals to warrant separate representation. Id. at 1041 (Van de Water, dissenting); id. at 1047-48 (Hunter, dissenting).
 
 
 36
 In December of 1982, the maintenance unit elected IBEW as its representative.[26] The Hospital, however, refused to bargain, stating that it believed the unit inappropriate for the reasons articulated by Chairman Van de Water and Member Hunter.[27] The Union followed with an unfair labor practice charge against the Hospital.[28]
 
 
 37
 On February 1, 1983, the Board's General Counsel issued a complaint against the Hospital charging a refusal to bargain in violation of sections 8(a)(1) and (5) and 8(d) of the Act, 29 U.S.C. Sec. 158(a)(1), (a)(5), (d) (1982).[29] Shortly thereafter, the Board transferred the matter to Washington, D.C. and issued an order to show cause why the General Counsel's motion for summary judgment against the Hospital should not be granted.[30] The Hospital filed a response and requested oral argument. Over one year later, the Board vacated its St. Francis I decision and denied the General Counsel's motion for summary judgment. St. Francis II, 271 N.L.R.B. 948 (1984).
 
 
 38
 In St. Francis II, the Board "reconsidered" its earlier action "[i]n view of the history of controversy surrounding the issue of appropriate bargaining units in the health care field ... and ... the frequency with which courts of appeals have disagreed with our unit determinations." Id. at 949. It rejected the two-tier analysis of St. Francis I in favor of a disparity-of-interest standard. This standard requires "sharper than usual differences (or 'disparities') between the wages, hours and working conditions, etc., of the requested employees and those in an overall professional or nonprofessional unit." Id. at 953.
 
 
 39
 Noting that the maintenance unit in this case included "lesser skilled individuals, who work closely with and share the same basic terms and conditions as the much larger group of service employees," id. at 954, the Board determined that the present record failed to demonstrate the requisite disparity-of-interest to justify separate representation. The Board, however, gave the parties the option to reopen the record with "the benefit of our current analysis."[31] Id.
 
 
 40
 The Union moved for reconsideration. Submitting that the present record is adequate, it argued that no reason exists for a remand.[32] The Board subsequently dismissed the unfair labor practice complaint against the Hospital because the record failed to demonstrate that the maintenance unit was appropriate.[33] IBEW followed with this appeal.
 
 III. ANALYSIS
 A. Standard of Review
 
 41
 The Board is entitled to deference when construing section 9 of the Act.[34] Normally, a bargaining unit determination by the Board will stand unless arbitrary and without substantial support.[35] The Board need only indicate "that it has exercised the discretion with which Congress has empowered it." Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941). This court cannot, however, sustain a unit determination by the Board "where it is based not on the agency's own judgment but on an erroneous view of the law." Prill v. NLRB, 755 F.2d 941, 947 (D.C.Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985). As the Supreme Court recognized in the landmark case of SEC v. Chenery Corp.:
 
 
 42
 If the [agency] action rests upon an administrative determination--an exercise of judgment in an area which Congress has entrusted to the agency--of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so. But if the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law.... [A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.[36]
 
 
 43
 This case plainly implicates the teachings of Chenery, as applied to the Board in our recent decision in Prill v. NLRB. When the Board bases a decision on a standard that it unjustifiably believes was mandated by Congress, the Board's decision must not be enforced, even though the Board might be able to adopt the very same standard in the exercise of its discretion.[37] In St. Francis II, the Board clearly considered the disparity-of-interest standard to be mandated by the 1974 Amendments to the Act.[38] We believe that the Board, however, misconstrued the law. The 1974 Amendments in no way require the Board to apply a disparity-of-interest standard when determining appropriate bargaining units in nonprofit health-care institutions. Congress did not modify section 9 in any way when it amended the Act in 1974. As the Supreme Court recently made clear in United States v. American College of Physicians,[39] although legislative history may give meaning to ambiguous statutory provisions, legal principles may not be gleaned solely from legislative history that has no statutory reference point.[40] Therefore, insofar as the Board found that section 9 of the Act mandates the disparity-of-interest standard, the Board was operating under an "erroneous view of the law." Prill, 755 F.2d at 947.
 
 
 44
 In addition, it is highly noteworthy that, for over forty years, the Board has construed section 9 of the Act to embody community-of-interest criteria.[41] The mere fact that the Board has interpreted the statute this way for so long makes the community-of-interest construction significant enough to foreclose the Board from now switching to a disparity-of-interest standard based solely on the Amendments' legislative history.[42] We therefore must remand this case for reconsideration, as the Board's decision rests on a fundamental misinterpretation of the 1974 Amendments to the Act.
 
 B. The St. Francis II Standard
 
 45
 The St. Francis II disparity-of-interest standard requires "sharper than usual differences (or 'disparities') between the wages, hours, and working conditions, etc., of the requested employees and those in an overall professional or nonprofessional unit."[43] In its decision, the Board characterized the disparity-of-interest standard as one which "fulfill[s] our dual obligations of adhering to the legislative intent behind enactment of the 1974 health care amendments to the Act and guaranteeing the representational interests of health care employees."[44] Section 9, however, is the only provision in the Act setting forth standards for unit determinations.[45] Despite this clear statutory mandate, the Board's decision in St. Francis II indicates that the Board formulated its disparity-of-interest standard solely on the basis of the legislative history of the 1974 Amendments without regard to the language in section 9 granting the Board broad discretion to determine appropriate collective bargaining units. In other words, the 1974 Amendments did nothing to modify section 9 of the NLRA, and yet, the decision in St. Francis II suggests that the 1974 Amendments somehow changed unit certification standards under the Act. The Board's position on this point is erroneous.
 
 
 46
 The disparity-of-interest standard appears to represent a radical departure from traditional community-of-interest criteria applied by the Board to determine appropriate bargaining units in all other industries covered by the Act. The disparity-of-interest standard presumes that only two appropriate bargaining units exist--professionals and nonprofessionals. Moreover, the standard places the burden on the employees to rebut this wall-to-wall units presumption.[46] The Board in St. Francis II completely fails to address how this radical new standard will effectuate the supposed rights of health-care employees under the Act.[47] Indeed, the Board's decision contains no reference to the language in section 9 of the Act and only passing reference to the Board's forty-year interpretation of that language to embody traditional community-of-interest criteria. Perhaps most revealing is that the Board itself identified "[t]he critical question addressed in today's decision ... [as] congressional intent regarding hospital bargaining units."[48]
 
 
 47
 In short, the Board has made no attempt to justify its disparity-of-interest standard as a reasonable interpretation of section 9 of the Act. Rather, the entire thrust of St. Francis II appears to be that the disparity-of-interest test is mandated by the 1974 Amendments, either without regard to the standards enunciated in section 9 or as a supervening standard for employees in the health-care industry. We must therefore examine the Amendments to determine whether the Board's position is a tenable construction of the law.
 
 
 48
 C. The Board's Determination that the Disparity-of-Interest Standard Is Statutorily Required
 
 
 49
 In adopting the disparity-of-interest standard, the Board stated that "Congress clearly intended that, in determining appropriate units in the health care area, the Board should apply a stricter standard than its traditional community-of-interest analysis."[49] The Board based its conclusion primarily on Congress' decision to insert the following language in the House and Senate Committee Reports:
 
 EFFECT ON EXISTING LAW
 Bargaining Units
 
 50
 Due consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry. In this connection, the Committee notes with approval the recent Board decisions in Four Seasons Nursing Center, 208 NLRB No. 50, 85 LRRM 1093 (1974), and Woodland Park Hospital, 205 NLRB No. 144, 84 LRRM 1075 (1973), as well as the trend towards broader units enunciated in Extendicare of West Virginia, 203 NLRB No. 170, 83 LRRM 1242 (1973).[1]
 
 
 51
 In addition, the Board relied on statements by various members of Congress concerning proliferation of bargaining units in the health-care industry. Most notably, the Board quoted Senator Williams' remark that "sometimes circumstances require that there be a number of bargaining units among nonsupervisory employees, particularly where there is such a history in the area or a notable disparity of interests between employees in different job classifications."[51] The Board also placed great emphasis on the following statement by Senator Taft, which the Board characterized as "an attempt to clarify any misunderstanding as to Congress' intent:"[52]
 
 
 52
 Certainly, every effort should be made to prevent a proliferation of bargaining units in the health care field and this was one of the central issues leading to agreement on this legislation. In this area there is a definite need for the Board to examine the public interest in determining appropriate bargaining units. NLRB v. Delaware-New Jersey Ferry Co., 128 F.2d 130 (3d Cir.1942).[53]
 
 
 53
 Finally, the Board cited the circuit court decisions that have interpreted the 1974 Amendments as as precluding the application of traditional community-of-interest criteria.[54]
 
 
 54
 Notwithstanding the foregoing considerations, we think that there is absolutely nothing in the Act to indicate that Congress intended the 1974 Amendments to restrict the Board's broad discretion under section 9 or to require the adoption of a disparity-of-interest test (mandating a presumption that only two appropriate bargaining units exist in the health-care industry). Indeed, we cannot stress strongly enough that, in adopting the disparity-of-interest standard, the Board ignored fundamental principles of statutory interpretation.
 
 1. Congress' Failure to Amend Section 9
 
 55
 The most fundamental principle in any case involving the interpretation of a statute is that "the 'starting point' must be the language of the statute itself." Lewis v. United States, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980); accord Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); Caminetti v. United States, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). Indeed, that language must be given conclusive weight unless the legislature expresses an intention to the contrary. Consumer Product Safety Comm'n, 447 U.S. at 108, 100 S.Ct. at 2056. Our analysis of the effect of the 1974 Amendments on the Board's discretion to determine appropriate bargaining units must therefore begin with the language of section 9 itself.
 
 
 56
 Under section 9, the Board must determine whether "the employer unit, craft unit, plant unit or subdivision thereof" constitutes an "appropriate" employee unit for collective bargaining. NLRA Sec. 9(b), 29 U.S.C. Sec. 159(b) (1982). Section 9(b) broadly defines a "unit appropriate for the purposes of collective bargaining" as one which "assure[s] to employees the fullest freedom in exercising the rights guaranteed by ... [the] Act." Id. The only limits placed on this broad definition by the Act are with respect to "appropriate" bargaining units of professionals, craftsmen and guards. NLRA Sec. 9(b)(1)-(3), 29 U.S.C. Sec. 159(b)(1)-(3) (1982).
 
 
 57
 For over forty years, the Board has consistently read the definition of a "unit appropriate for the purposes of collective bargaining" under section 9 to embody community-of-interest criteria.[55] Although the Board's application of community-of-interest criteria has varied "from industry to industry and from plant to plant,"[56] the Board traditionally has considered "similarity of wages and hours, extent of common supervision, frequency of contact with other employees, degree of interchange and functional integration with other employees, and area practice and patterns of bargaining." Allegheny Gen. Hosp., 239 N.L.R.B. 872, 873 (1978), enforcement denied, 608 F.2d 965 (3d Cir.1979); see Kalamazoo Paper Box Corp., 136 N.L.R.B. 134, 137 (1962). Until the time of the 1974 Amendments to the Act, Congress never expressed any dissatisfaction with the Board's construction of section 9 to embody community-of-interest criteria.
 
 
 58
 When Congress amended the Act in 1974, it did consider modifying, with respect to nonprofit health-care institutions, section 9's definition of a "unit appropriate for the purposes of collective bargaining."[57] The Taft proposal would have limited the number of health-care bargaining units to four (professional, technical, clerical, and service and maintenance) unless the employer and the union agreed otherwise.[58] Congress, however, decided against the modification of section 9 proposed by Senator Taft. This fact alone, we believe, "strongly militates against a judgment that Congress intended a result that it expressly declined to enact."[59]
 
 
 59
 Congress' rejection of the Taft proposal takes on still greater significance when it is recalled that Congress did amend other sections of the Act in 1974 to provide special provisions for nonprofit health-care institutions, but did not change one word of section 9.[60] In Beth Israel Hospital v. NLRB,[61] the Supreme Court ruled that because Congress decided not to amend section 8(a)(1) of the Act in 1974, Congress clearly did not intend the Board to apply special rules for union solicitation by nonprofit health-care employees.[62] As the Supreme Court recognized:
 
 
 60
 Congress did not enact any special provision regarding solicitation and distribution in particular or disruption of patient care in general other than ... [by adding specific strike notice and mediation provisions]. We can only infer, therefore, that Congress was satisfied to rely on the Board to continue to exercise the responsibility to strike the appropriate balance between the interests of hospital employees, patients, and employers.[63]
 
 
 61
 We think it clear that by failing to modify section 9, Congress implicitly approved the Board's forty-year construction of section 9 to embody community-of-interest criteria.[64] This is not to say, however, that the Board may not switch to another unit standard in the exercise of its discretion under section 9.[65] Rather, we merely think that Congress did not intend to require that the Board make such a switch.
 
 
 62
 2. The Committee Reports' Admonition Against Undue Proliferation
 
 
 63
 The Board takes the position that Congress' failure to amend section 9 does not end the story because, by inserting the "agreed upon" language in the House and Senate Committee Reports,[66] Congress placed a "gloss" on section 9. The Board maintains that the statements by Senator Williams and Senator Taft support its position. The Board also points to the circuit court decisions holding that the 1974 Amendments preclude the application of traditional community-of-interest criteria to determine appropriate health-care bargaining units. We believe, however, that while some legitimate use may exist for the Committee Reports' language and other extra-statutory materials in this case, none of these sources mandate the Board's switch to a disparity-of-interest standard.
 
 
 64
 First, we emphasize that the Committee Reports' admonition against undue proliferation is not part of the Act. While a committee report may ordinarily be used to interpret unclear language contained in a statute, a committee report cannot serve as an independent statutory source having the force of law.[67] As this court recently explained in Abourezk v. Reagan:[68]
 
 
 65
 [I]t [is] plainly wrong as a general matter ... to regard committee reports as drafted more meticulously and as reflecting the congressional will more accurately than the statutory text itself. Committee reports, we remind, do not embody the law. Congress, as Judge [now Justice] Scalia recently noted, votes on the statutory words, not on different expressions packaged in committee reports. Hirschey v. FERC, 777 F.2d 1, 7-8 & n. 1 (D.C.Cir.1985) (Scalia, J., concurring).[69]
 
 
 66
 We believe that a cardinal principle of the judicial function of statutory interpretation is that courts have no authority to enforce principles gleaned solely from legislative history that has no statutory reference point. See United States v. American College of Physicians, --- U.S. ----, 106 S.Ct. 1591, 1598, 89 L.Ed.2d 841 (1986) ("[D]espite the [Committee] Reports' seeming endorsement of a per se rule, we are hesitant to rely on that inconclusive legislative history either to supply a provision not enacted by Congress ..., or to define a statutory term enacted by a prior Congress.").[70] As Judge Fairchild aptly observed in his dissent in Mary Thompson Hospital v. NLRB, 621 F.2d 858, 864 (7th Cir.1980) (Fairchild, J., dissenting):
 
 
 67
 The [Committee Reports'] "admonition" is not part of the statute. Nor was there any change in the portion of the statute governing the Board's choice of an appropriate unit, so that the "admonition" would be helpful in interpreting the change.
 
 
 68
 ... [T]he "admonition" is not appropriate for application by the courts in deciding whether an order of the Board conforms to the statute or whether the Board has abused the discretion conferred on it by the statute.
 
 
 69
 Second, we point out that most of the statements by legislators regarding the Committee Reports' admonition do not support the Board's rejection of traditional community-of-interest criteria in favor of a disparity-of-interest standard. Clearly Senator Dominick did not view the admonition as having the force of law. Senator Dominick voted against reporting the bill out of committee precisely because "[t]he potential for recognition of numerous bargaining units ... merits specific statutory language."[71] While Senator Williams did use the term "disparity-of-interest,"[72] his statement, when considered as a whole, does not suggest that the Board must apply a different standard to health-care bargaining units. Indeed, Senator Williams seemed to refer approvingly to the traditional community-of-interest analysis when he stated that "the Board has, as a rule, tended to avoid an unnecessary proliferation of collective bargaining units."[73] Only Senator Taft's remarks directly suggest that the Committee Reports' admonition places a significant "gloss" on section 9.[74] Yet, as the Supreme Court has often recognized, "even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history." Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980); accord Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). We think it clear in this case that Senator Taft's remarks cannot be given controlling weight. Not only do the statements by other legislators suggest a contrary view of the Committee Reports' admonition,[75] but also the admonition itself refers approvingly to decisions in which the Board applied traditional community-of-interest criteria to bargaining units in proprietary health-care institutions.[76]
 
 
 70
 In addition, we must not overlook the policy embodied in the 1974 Amendments. In extending the Act to nonprofit health-care employees, Congress found "that improvements in health care would result from the right to organize, and that unionism is necessary to overcome poor working conditions retarding the delivery of quality health care." Beth Israel Hosp. v. NLRB, 437 U.S. 483, 499-500, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978). When we consider the Committee Reports' admonition and the statements of individual legislators against the backdrop of this policy favoring collective labor organization in the health-care industry, we think it plain that Congress did not intend to mandate a standard that burdens hospital employees with a presumption in favor of wall-to-wall units.[77] Rather, Congress was satisfied that the Board would continue to exercise its discretion under the Act in striking "the appropriate balance between the interests of hospital employees, patients and employers." Id. at 497, 98 S.Ct. at 2471.
 
 
 71
 3. The Board's Contemporaneous Construction of the 1974 Amendments
 
 
 72
 Yet another factor militating against the Board's decision in this case is the Board's own contemporaneous construction of the 1974 Amendments. Following the passage of the 1974 Amendments, the Board took the position that Congress had not precluded it from applying traditional community-of-interest criteria to determine appropriate bargaining units of health-care employees.[78] From its first decision in 1975 until the St. Francis II decision in 1984, the Board applied the traditional criteria in all health-care unit cases.[79] Although some other circuits have failed to do so, we place significance on the Board's contemporaneous construction of the 1974 Amendments. For just as courts must "pay heed to the 'contemporaneous construction of a [new] statute by [those] charged with setting its machinery in motion,' "[80] so too, we believe, must courts defer to an agency's contemporaneous interpretation of an amended statute, unless of course that interpretation clearly conflicts with the intent of Congress.[81] Subsequent to the 1974 Amendments, the Board correctly determined that Congress clearly did not intend the 1974 Amendments to preclude the Board from either applying traditional community-of-interest criteria to bargaining units in the health-care industry, or adopting another reasonable unit standard in the exercise of its discretion under section 9.[82]
 
 IV. CONCLUSION
 
 73
 We hold that in adopting the disparity-of-interest standard, the Board failed to rely on its own judgment and expertise as required by section 9. Instead, the Board rested its decision on a clear misreading of the 1974 Amendments to the Act. When Congress extended the Act in 1974 to nonprofit health-care employees, it did not in any way modify section 9. While we recognize that the Committee Reports and other extra-statutory materials discuss prolif eration of bargaining units in the health-care industry, we stress that Congress, in the final analysis, never adopted a proposal to modify section 9.
 
 
 74
 The Board has followed a strange (and unacceptable) way of reading legislative history in treating language in a committee report as a statutory provision and then using statements by individual congressmen to "interpret" that language and give it the force of law. We reject the Board's approach because one of the most fundamental principles of statutory interpretation is that committee reports and other extra-statutory materials may only be used to interpret the language of the statute itself and may not serve as independent sources of law.[83]
 
 
 75
 This is not a case where the Board's mistaken view of the law "had no bearing on the procedure used or the substance of decision reached."[84] The Board here previously found the maintenance unit appropriate under the modified community-of-interest approach of St. Francis I;[85] thus, it is clear that the disparity-of-interest standard constitutes a significant departure from traditional community-of-interest criteria.[86] Moreover, the result in a case like this will often depend not only on the governing standard, "but also on the manner in which that standard is applied, and this may well be influenced by whether the Board believes the standard to be dictated by the statute itself or rather adopted as a matter of policy in order to effectuate the purposes of the Act."[87]
 
 
 76
 Because the Board improperly interpreted the 1974 Amendments to the Act as mandating the disparity-of-interest standard and compelling a presumption of only two appropriate units in the health-care industry, its decision has no basis in the law. Accordingly, we remand the case to the Board for reconsideration of whether the Hospital's maintenance employees constitute a "unit appropriate for the purposes of collective bargaining"[88] under section 9 of the NLRA.
 
 
 77
 So Ordered.
 
 BUCKLEY, Circuit Judge, concurring:
 
 78
 This case is a classic example of the dangers that can flow from an indiscriminate attempt to read legislative meaning into congressional tea leaves. I will therefore begin by highlighting the lessons to be drawn from the case before addressing an aspect of the court's opinion with which I cannot agree.
 
 
 79
 When one undertakes to use legislative history as a tool of statutory construction, surely the first part of wisdom is to remember that Congress is a political as well as a legislative body, and that its members will put the privileges and facilities of their respective chambers to political as well as legislative uses. Thus not every utterance to be found in committee reports or the Congressional Record may be assumed to represent statutory gold.
 
 
 80
 In the case before us, a modest degree of caution would have spared the Board the errors identified in the court's opinion, as the political story that emerges from the record is clear enough. In 1973, key members of the Senate and House labor committees decided the time had come to eliminate the exemption of nonprofit health care institutions from coverage by the National Labor Relations Act. At the same time, they recognized that success required reconciling the strong differences existing between the two constituencies most directly involved; namely, the unions' goal of an unrestricted right to organize health care employees, and hospital administrators' concern over their continued ability to deliver health care services uninterrupted by labor disputes.
 
 
 81
 In the Senate, two bills were introduced and referred to the Committee on Labor and Public Welfare. The first, which was authored by Senators Cranston and Javits, would have brought nonprofit health care employees under NLRA coverage without the addition of any industry-specific restrictions. The second, introduced by Senator Taft, incorporated restraints on the right to strike, a ceiling on bargaining units, and other provisions sought by hospital officials.
 
 
 82
 Ultimately, in order to break a deadlock, the Senate and House committees worked out a compromise with representatives of labor and management that would meet the former's desire to bring nonprofit health care employees under the NLRA with a minimum of restrictions while, at the same time, addressing the latter's concerns over the potential disruption of hospital care. As part of the arrangement, the Cranston-Javits and Taft bills were withdrawn; Senator Taft introduced a substitute measure, S. 3203, that preserved his restrictions on strikes but dropped his cap on bargaining units; and the Senate and House committees agreed to include the admonitory language in their reports. As a result, the legislative baton passed to S. 3203, and the bargaining units issue moved from the legislative to the political agenda.
 
 
 83
 This fact should have been self-evident from Senator Dominick's clear-cut statement as to why he had voted against reporting S. 3203 out of committee:
 
 
 84
 I am also concerned about the bill's failure to treat bargaining units.... The committee has recognized the need for special treatment of the hospital industry. A proliferation of bargaining units, however, can pose a serious threat to uninterrupted health-care.
 
 
 85
 ... A hospital should be protected by statute from being placed in a position of continual bargaining with different units in order to minimize the threats to patient care.
 
 
 86
 Individual views of Senator Peter H. Dominick, S.Rep. No. 766, 93d Cong., 2d Sess. 44-45 (1974), U.S.Code Cong. & Admin.News 1974, p. 3958, reprinted in Legislative History at 51-52. Senator Dominick was a careful legislator. As a member of the Senate Committee on Labor and Public Welfare, he was fully aware of the report language. Nevertheless he declined to support the compromise because it failed to provide the legal safeguards he considered necessary.
 
 
 87
 If there were still room for doubt, it should have been put to rest by the fact that when Senator Cranston described the key elements of the legislation in his capacity as floor manager for the 1974 Amendments, he made no mention of the committee admonition. See 120 Cong.Rec. 12,936-37 (1974). Nor did Senators Williams and Javits when, in their respective capacities as chairman and ranking member of the committee, they presented their own analyses of S. 3203. Id. at 12,937-40. The reason is obvious. The legislation before the Senate did not amend section 9 of the Act or otherwise address the question of bargaining units; therefore, the admonition was not relevant to its analysis.
 
 
 88
 This does not mean that the agreement to include the report language was an empty gesture. To the contrary, there can be little doubt that the two committees expected the Board to pay attention to their directive--not because it had the force of law, but because agencies are not given to ignoring the commands of potentates who control their budgets and oversee their operations. As counsel for one agency recently acknowledged in oral argument before this court, while an instruction in an oversight committee's report did not bind his agency legally, it did so "as a practical matter." To underscore his point, he added: "[W]e are not talking law school enforcement, legal textbook arguments; we're talking political reality here." Meredith Corp. v. FCC, 809 F.2d 863 (D.C.Cir.1987).
 
 
 89
 This political reality is well understood by professionals. See, e.g., J. Mashaw & R. Merrill, Administrative Law: The American Public Law System 74-83 (1985) (identifying "pervasive methods of legislative control" over agencies in general); Gross, Conflicting Statutory Purposes: Another Look at Fifty Years of NLRB Law Making, 39 Indus. & Lab.Rel.Rev. 7, 8-10 (1985) (detailing political control over the NLRB in particular). Thus the inclusion of the admonition in the committee reports could be expected to provide the margin of assurance required to secure the support of at least some of the legislators and lobbyists who were concerned over the prospect of proliferating bargaining units.
 
 
 90
 As the admonitory language served a political rather than a legal purpose, each of the key legislators no doubt felt free to "accentuate the positive" by providing his own distinct interpretation on its meaning and effect. This may explain the contrasting glosses they placed on the language, as noted in section II.A. of the court's opinion. Senator Taft, for example, categorized the admonition as stressing "the necessity [for] the Board to reduce and limit the number of bargaining units in a health care institution," 120 Cong.Rec. 12,944 (1974) (statement of Sen. Taft) (emphasis added), while Senator Williams asserted that "the committee clearly intends that the Board give due consideration to its admonition to avoid an undue proliferation of units...." 120 Cong.Rec. 22,575 (1974) (statement of Sen. Williams) (emphasis added). It is unlikely that either senator was upset by the other's interpretation because no doubt each understood the other was engaged in reassuring his own constituencies in order to consolidate support for their common enterprise.
 
 
 91
 I do not claim my scenario is accurate, merely that it is plausible. As such, it suggests an endemic interplay, in Congress, of political and legislative considerations that makes it necessary for judges to exercise extreme caution before concluding that a statement made in floor debate, or at a hearing, or printed in a committee document may be taken as statutory gospel. Otherwise, they run the risk of reading authentic insight into remarks intended to serve quite different purposes. Furthermore, to the degree that judges are perceived as grasping at any fragment of legislative history for insights into congressional intent, to that degree will legislators be encouraged to salt the legislative record with unilateral interpretations of statutory provisions they were unable to persuade their colleagues to accept; a process made especially easy in the Senate, whose members are allowed to introduce into the printed record of a debate remarks that were never spoken on the floor, hence never subjected to the hazard of rebuttal.
 
 
 92
 An additional reason for the exercise of judicial caution is that judges confined to the printed page may not always be able to separate legislative wheat from political chaff, to identify and discard remarks that are designed not so much to inform colleagues as to reach beyond Capitol Hill to audiences ranging from lobbyists who may help a beleaguered legislator achieve his goals, to home state journalists on whose reports the next election may well depend. It is not always easy to distinguish which remarks will fit in which category, especially when read years after the event by judges who have neither the time to review the entire history of a particular bill nor the experience to filter out the political overtones.
 
 
 93
 The hazards of reconstructing legislative intent are unfortunately real; witness the remarkable fact that all ten circuits hitherto construing post-1974 nonprofit health care unit certifications have accorded legal weight to the committee admonition. See maj. op. at 704. Two circuits, the Ninth and Tenth, have even gone so far as to order the Board to adopt the disparity-of-interest test, thereby effectuating by judicial fiat what Senator Taft concluded he could not accomplish by statute. The balance of the circuits ruling on this issue--the Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh--fare better, but only in that they do not themselves dictate the precise weight to be accorded the admonition. See, e.g., maj. op. at 703-705. Indeed, to date only Judge Fairchild of the Seventh Circuit has stated, in a brief dissent, what we take to be the essential point: as the admonition and the remarks addressed to it were divorced from the legislation then before Congress, they are an illegitimate source of authority for the agency's construction of the law. See maj. op. at 713.
 
 
 94
 Whatever may have persuaded our sister circuits to mistake legislative politics for law, we find the record unambiguous. Senator Taft sought to limit bargaining units in nonprofit health care institutions, but withdrew the proposal as part of a larger compromise. Given this undisputed legislative background, the legal conclusion we reach is inescapable. Agencies receive their power to impose decisions on private parties from statutory law, and not from the advisory instructions of particular committees. Had the court's opinion stopped with the conclusion that the published admonition was a legal nullity, I would have been in full agreement. Unfortunately, the court abandons the logic of its own position by then according legal significance to a single committee's failure to act.
 
 
 95
 First, the court states that because a Senate committee did not modify section 9, "Congress implicitly approved the Board's forty-year construction of section 9 to embody community-of-interest criteria." Maj. op. at 711 (emphasis added) (footnote omitted). See also maj. op. at 711 ("Congress ... did consider modifying ... [section 9]"), 711 ("Congress, however, decided against the modification of section 9 proposed by Senator Taft."), id. ("Congress' rejection of the Taft proposal...."). Moreover, while declining to say whether the Board may in its discretion "switch to another unit standard," id., the opinion observes, in ominous tones, that "the Board would have to explain its action adequately, particularly because the Board has always construed section 9 to embody community-of-interest criteria." Id. at n. 65 (citations omitted) (emphasis in original). At best, in light of the manifest reality that Congress never contemplated a proposed modification to section 9, the court's opinion engages in what is in effect an advisory opinion.
 
 
 96
 The notion of implicit approval is not so easily cabined as dicta, however, for it holds to the idea, rejected by the very rationale of the case, that authoritative congressional intent may be deduced from a committee's failure to adopt a proposal. Formally, the question is the proper weight to be accorded legislative proposals that do not reach Congress. The answer should be self-evident.
 
 
 97
 A committee's purposes cannot be imputed to Congress as a whole, and references to committee action (or inaction) on the Senate floor will not change this fact. Senator Taft's original bill was never presented for debate, and neither the Senator nor anyone else offered floor amendments that would have given Congress the opportunity to accept or reject his proposed limitation on unit representation. Therefore, it cannot be said that Congress --which acts through a majority of its 535 members--expressed any opinion whatever on the merits of his proposal, let alone endorsed a forty-year-old interpretation of which most members were in all probability wholly unaware.
 
 
 98
 Certainly, one does not hear the court arguing that because the committee failed to adopt the Cranston-Javits bill, Congress implicitly disapproved the application of the community-of-interest test to nonprofit health care workers. To travel this path is to end up at the bizarre hypothesis, actually advanced by one commentator, that the withdrawal of both bills should be taken to mean that Congress intended to end up somewhere in the middle between a numerical cap and the traditional test. See Bumpass, Appropriate Bargaining Units in Health Care Institutions: An Analysis of Congressional Intent and its Implementation by the National Labor Relations Board, 20 B.C.L.Rev. 867, 884-86 (1979). Rather, it seems to me this is a classic case in which to acknowledge that "[i]naction by Congress is due generally to reasons too diffuse, ephemeral, and ultimately unaccountable ..." to provide a basis for statutory construction. Advanced Micro Devices v. CAB, 742 F.2d 1520, 1541 (D.C.Cir.1984).
 
 
 99
 Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 modified, 339 U.S. 908, 70 S.Ct. 564, 94 L.Ed. 1336 (1950), is also on point. The issue there was whether the newly passed Administrative Procedure Act applied to deportation hearings. The Immigration Department, after an adverse decision in district court, sought exempting legislation from Congress. Committees in both houses reported out favorable bills, but Congress adjourned and no further action was taken. The government and Sung each sought to read significance into this state of affairs. But the Supreme Court, in words wholly applicable here, declared the committee actions of no consequence whatsoever: "We draw, therefore, no inference in favor of either construction of the Act--from the Department's request for legislative clarification, from the congressional committee's willingness to consider it, or from Congress' failure to enact it." Id. at 47-48, 70 S.Ct. at 453.
 
 
 100
 The court makes an equally unwarranted attempt to entrench the community-of-interest standard by "plac[ing] significance on the Board's contemporaneous construction of the 1974 Amendments." Maj. op. at 714. Although the issue is not before us, the suggestion here is that our review of the Board's 1984 St. Francis II decision must defer to the policy applied by the agency to bargaining unit questions in the period immediately following the enactment of the Health Care Amendments, as long as that policy does not clearly conflict with the intent of Congress. This approach contradicts the obvious necessity and indeed the very logic for deference to agency decisionmaking, which is to place policy choices (within the limits permitted by statute) in the hands of delegated agents of Congress, subject to their expertise and experience. See, e.g., Beth Israel Hospital v. NLRB, 437 U.S. 483, 508, 98 S.Ct. 2463, 2477, 57 L.Ed.2d 370 (1978) ("The authority of the Board to modify its construction of the Act in light of its cumulative experience is, of course, clear." (citations omitted)).
 
 
 101
 Although it is true that contemporaneous agency decisionmaking may sometimes be accorded special deference, I believe the panel misapplies this rule in the present case. The rationale for special deference to a contemporaneous construction is to aid courts in construing ambiguous statutory language and does not operate when the NLRB, in light of eleven years' experience applying the Act to nonprofit health care workers, overturns a prior construction of its organic statute in favor of a new permissible construction. See, e.g., NLRB v. J. Weingarten, Inc., 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975) (striking down court of appeals for "impermissibly encroach[ing] upon the Board's function" "to adapt the Act" "in light of changing industrial practice and the Board's cumulative experience"); Columbia Broadcasting System, Inc. v. FCC, 454 F.2d 1018, 1026 (D.C.Cir.1971) ("We do not challenge [an agency's] well established right to modify or even overrule an established precedent or approach, for an administrative agency concerned with furtherance of the public interest is not bound to rigid adherence of its prior rulings." (footnote omitted)).
 
 
 102
 Rather, the appropriate legal standard is rooted in the deference due permissible NLRB constructions of its broadly delegated authority. The well-known, settled requirement is that the agency departure from precedent be based on reasoned decisionmaking. Id. ("[W]hen an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law." (footnote omitted)); Oil, Chemical & Atomic Workers Int'l v. NLRB, 806 F.2d 269, 273-74 (D.C.Cir.1986). Had the Board, in St. Francis II, given a reasoned explanation for its shift in policy and not placed a legally untenable reliance on the committees' admonition, we would have been required to determine whether its most recent construction met the standards outlined in Weingarten, 420 U.S. at 267, 95 S.Ct. at 968 ("fair and reasoned balance upon a question within its special competence, [the] newly arrived at construction of Sec. does not exceed the reach of that section, and the Board has adequately explicated the basis of its interpretation"). If we determined that the Board had met those standards, we would have been obliged to defer to it whatever our own assessment of the correctness of the Board's original construction.
 
 
 103
 If it were to hold otherwise, an appellate court would be substituting its view of the statute, under the rubric of deference to an abandoned agency view, for the agency's own updated judgment. Such an outcome would be contrary to the Court's express direction that the Board's reconciliation of conflicting interests of labor and management be "subject to limited judicial review." Id. at 267, 95 S.Ct. at 968 (quoting NLRB v. Truck Drivers Local 449, Int'l Bhd. of Teamsters, 353 U.S. 87, 96, 77 S.Ct. 643, 648, 1 L.Ed.2d 676 (1957). This is true when the Board reverses ground, and even when its newest view is not required by the Act. It need only be a permissible construction. Id. at 266-67, 95 S.Ct. at 968-67. See also NLRB v. Local 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 351, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978) ("An administrative agency is not disqualified from changing its mind; and when it does, the courts still sit in review of the administrative decision and should not approach the statutory construction issue de novo and without regard to the administrative understanding of the statute[ ]."); Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 2782 n. 11, 81 L.Ed.2d 694 (1984) ("The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." (citations omitted)).
 
 
 104
 Against this clear authority, the doctrine of contemporaneous construction cannot be invoked here to trump or undermine the NLRB's freedom to review its past policy in determining how section 9 should be applied to nonprofit health care workers in the future.
 
 
 105
 The court's emphasis on the settled weight of the community-of-interest standard seems particularly inappropriate given the Board's obligation to construe section 9 in light of the whole statute, including the Health Care Amendments. Congress charged the Board, not circuit judges, to make "appropriate" unit determinations for employees in a complex, hitherto uncovered industry, given to "unique considerations that do not apply in the industrial settings with which the Board is more familiar." Beth Israel, 437 U.S. at 508, 98 S.Ct. at 2477 (quoting NLRB v. Beth Israel Hospital, 554 F.2d 477, 481 (1st Cir.1977)). Our role is to stand and wait.
 
 
 106
 In remanding, we do not say how or whether experience with the nonprofit hospital setting might influence the standard adopted by the Board. We do say, and it is quite enough, that the Board may not attach legal significance to the committees' admonition.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(a) (1982)
 
 
 [1]
 Tally of Ballots, reprinted in Joint Appendix ("J.A.") 289
 
 
 [2]
 Act of July 26, 1974, Pub.L. No. 93-360, 88 Stat. 395
 
 
 [3]
 Letter from James Logan to Albert Byars (Jan. 17, 1983), reprinted in J.A. 294; see St. Francis I, 265 N.L.R.B. at 1034 (Van de Water, dissenting); id. at 1042 (Hunter, dissenting). For a discussion of the Board's community-of-interest criteria, see note 15 infra
 
 
 [4]
 Complaint, reprinted in J.A. 299-300; Motion to Transfer Case to Board and for Summary Judgment, reprinted in J.A. 304-09
 
 
 [5]
 Order Dismissing Complaint, reprinted in J.A. 332-33
 
 
 [6]
 29 U.S.C. Sec. 159 (1982)
 
 
 [7]
 Allied Chemical & Alkali Workers, Local No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 171-72, 92 S.Ct. 383, 393-94, 30 L.Ed.2d 341 (1971)
 
 
 [8]
 See Part II.A. infra
 
 
 [9]
 See notes 67 & 70 infra
 
 
 [10]
 Section 9(b) also provides special standards for the certification of units of professional employees, craftsmen and guards. 29 U.S.C. Sec. 159(b)(1)-(3) (1982)
 
 
 [11]
 Congress covered nonprofit health-care institutions by deleting from section 2(2) of the Act, 29 U.S.C. Sec. 152(2) (1982), the provision that an "employer" does not include "any corporation or association operating a hospital, if no part of net earnings inures to the benefit of any private shareholder or individual." Labor Management Relations Act, 1947, ch. 120, 61 Stat. 136
 
 
 [12]
 Section 1(b) of the 1974 Act, 88 Stat. 395, makes special provisions applicable to "health care institution[s]." Section 1(d), 88 Stat. 396, amended Sec. 8(d) of the Act to require, with respect to health-care institutions, 90-day notice of termination or expiration of a contract; 60-day notice to the Federal Mediation and Conciliation Service (FMCS) of contract termination or expiration; and 30-day notice to FMCS of initial contract negotiation disputes. Section 1(d), 88 Stat. 396, also requires that health-care institutions and labor organizations participate in mediation at the direction of FMCS. Section 1(e), 88 Stat. 396, added Sec. 8(g) to the Act, which requires labor organizations to give 10-day written notice to health-care institutions and FMCS before engaging in pickets, strikes or other concerted refusals to work. Section 2 of the 1974 Act, 88 Stat. 396, added Sec. 213 to the Labor Management Relations Act, 29 U.S.C. Sec. 183 (1982), which authorizes, under certain conditions, the convening of an impartial Board of Inquiry to investigate health-care labor disputes. For a discussion of the legislative history of these provisions, see Vernon, Labor Relations in the Health Care Field Under the 1974 Amendments to the National Labor Relations Act: An Overview and Analysis, 70 NW.L.REV. 202 (1975)
 
 
 [13]
 Senator Taft explained that the "agreed upon ... report language ... [was] endorsed by labor and management groups, including the Service Employees International Union of the AFL-CIO, the Laborers' International Union of North America of the AFL-CIO, many State hospital associations ... the Department of Labor and the Office of Management and Budget for the administration." 120 CONG.REC. 12,944 (1974) (statement of Sen. Taft), reprinted in LEGISLATIVE HISTORY at 112. See Pointer, The 1974 Health Care Amendments to the National Labor Relations Act, 26 LABOR L.J. 350, 355 (1975) (discussing events which led to the adoption of the Committee Reports' language)
 
 
 [14]
 The Conference Report resolved two differences between the House and the Senate bills that were unrelated to the bargaining unit question. S. REP. NO. 1175, 93d Cong., 2d. Sess. 4-5, reprinted in LEGISLATIVE HISTORY at 348-49
 
 
 [15]
 In certifying units appropriate for collective bargaining under section 9 of the Act, the Board groups together "only employees who have substantial mutual interests in wages, hours, and other conditions of employment." 1950 NLRB Ann.Rep. 39 (1951). For over forty years, the Board has applied a "community-of-interest" standard to identify appropriate units. See, e.g., In re Chrysler Corp., 1 N.L.R.B. 164, 169-70 (1936); In re International Mercantile Marine Co., 1 N.L.R.B. 384, 388-90 (1936); In re International Filter Co., 1 N.L.R.B. 489, 494 (1936). Under this standard, an appropriate unit consists of employees "whose similarity of function and skills create a community of interest such as would warrant separate representation." American Cyanamid Co., 131 N.L.R.B. 909, 910 (1961). Criteria which the Board traditionally has considered "to determine the existence of this requisite community of interest ... include similarity of wages and hours, extent of common supervision, frequency of contact with other employees, degree of interchange and functional integration with other employees, and area practice and patterns of bargaining." Allegheny Gen. Hosp., 239 N.L.R.B. 872, 873 (1978), enforcement denied on other grounds, 608 F.2d 965 (3d Cir.1979); see Kalamazoo Paper Box Corp., 136 N.L.R.B. 134, 137 (1962). The Board, however, applies these criteria very flexibly, recognizing that "the effect of any one factor, and therefore the weight to be given it in making the unit determination, will vary from industry to industry and from plant to plant." American Cyanamid, 131 N.L.R.B. at 911; see Otis Hosp., 219 N.L.R.B. 164, 165 (1975) (acknowledging that because "not all health care institutions may be exactly alike" emphasis given to particular community-of-interest criteria may vary)
 
 
 [16]
 Along with Mercy Hosps., the Board decided seven other initial lead cases regarding health-care bargaining units: St. Catherine's Hosp., 217 N.L.R.B. 787 (1975); Newington Children's Hosp., 217 N.L.R.B. 793 (1975); Sisters of St. Joseph of Peace, 217 N.L.R.B. 797 (1975); Duke University, 217 N.L.R.B. 799 (1975); Mount Airy Psychiatric Center, 217 N.L.R.B. 802 (1975); Barnert Memorial Hosp. Center, 217 N.L.R.B. 775 (1975); Shriners Hosps. for Crippled Children, 217 N.L.R.B. 806 (1975)
 
 
 [17]
 Compare American Cyanamid Co., 131 N.L.R.B. 909, 910-11 (1961) (finding unit of maintenance employees appropriate) with Monsanto Co., 183 N.L.R.B. 415, 417 (1970) (refusing to certify unit of maintenance employees because not a separate and readily identifiable group)
 
 
 [18]
 But see NLRB v. Walker County Medical Center, 722 F.2d 1535, 1540 (11th Cir.1984) (dictum) (possibility of three units not "undue proliferation"); NLRB v. Res-Care, Inc., 705 F.2d 1461, 1470-71 (7th Cir.1983) (dictum) (four or fewer units not "undue proliferation")
 
 
 [19]
 Until our decision today, no circuit court has ruled that the Board may apply traditional community-of-interest criteria to certify bargaining units of maintenance employees in health-care institutions. The First and Fifth Circuits have not yet addressed the issue
 
 
 [20]
 Petition, reprinted in J.A. 3. At the time of the Union's petition, the Hospital was called St. Joseph Hospital East, Inc. The Hospital changed its name on February 29, 1980 to St. Francis Hospital. St. Francis I, 265 N.L.R.B. 1025, n. 1 (1982)
 
 
 [21]
 Id
 
 
 [22]
 Transcript of Certification Hearing 13, reprinted in J.A. 12
 
 
 [23]
 The Union petitioned for a unit consisting of the following positions: (1) Electrician; (2) Maintenance Mechanic; (3) Refrigeration Mechanic; (4) Steam and Refrigeration Engineer; (5) Boiler Operator, (6) Electronics Technician; (7) Telephone-Communications Technician; (8) Plumber; (9) Pneumatic Control Technician; (10) Carpenter; (11) Tilesetter; (12) Painter and (13) All Maintenance Helper Classifications. Petition, reprinted in J.A. 3. The Regional Director added the following maintenance department positions to the unit: (1) X-Ray Processor Mechanic; (2) Refuse and Linen Collectors; (3) Utility Operators; (4) Cabinet Makers; (5) HVAC Trainee; (6) HVAC Mechanic and (7) Groundskeeper. Decision and Direction of Election, reprinted in J.A. 260; see Exhibits to Certification Hearing, reprinted in J.A. 252-59 (listing Hospital's service and maintenance positions)
 
 
 [24]
 In Allegheny General Hospital, the Board stated that it "must respectfully disagree" with the Third Circuit's view in St. Vincent's Hospital v. NLRB, 567 F.2d 588 (3d Cir.1977), that the legislative history of the 1974 Amendments precludes the Board from certifying separate units of maintenance and powerhouse employees at health-care institutions. 239 N.L.R.B. 872, 872-73 (1978). The Third Circuit sharply responded that "a disagreement by the NLRB with a decision of this court is simply an academic exercise that possesses no authoritative effect. It is in the court of appeals and not in an administrative agency that Congress has vested the power and authority to enforce orders of the NLRB.... For the Board to predicate an order on its disagreement with this court's interpretation of a statute is for it to operate outside the law." Allegheny Gen. Hosp. v. NLRB, 608 F.2d 965, 970 (3d Cir.1979)
 
 
 [25]
 Member Hunter claimed that he was "reluctant to apply any 'presumptions,' " but did agree with the disparity-of-interest analysis. 265 N.L.R.B. at 1047 n. 126 (Hunter, dissenting). Yet, because the disparity-of-interest analysis requires a demonstration that the proposed unit has interests sufficiently disparate from the larger group of professionals or nonprofessionals, the analysis necessarily presumes that any unit more limited than professionals or nonprofessionals is inappropriate unless the employees prove otherwise
 
 
 [26]
 Tally of Ballots, reprinted in J.A. 289
 
 
 [27]
 Letter from James Logan to Albert Byars (Jan. 17, 1983), reprinted in J.A. 294
 
 
 [28]
 Charge Against Employer, reprinted in J.A. 295
 
 
 [29]
 Complaint, reprinted in J.A. 299-300
 
 
 [30]
 Order Transferring Proceeding to the Board and Notice to Show Cause, reprinted in J.A. 311-12
 
 
 [31]
 In his dissent, Member Zimmerman characterized the majority's disparity-of-interest test as "an obfuscatory legal approach which is far worse than several reasonable alternatives to St. Francis I." Id. at 958 (Zimmerman, dissenting). Member Zimmerman identified these reasonable alternatives as (1) adoption of a disparity-of-interest test "not wholly at odds with the Board's traditional community-of-interests criteria which were nowhere rejected by the Congress in 1974;" (2) formulation of "comprehensive and specific rules" through rulemaking; or (3) resolution of the health-care unit controversy through certiorari to the Supreme Court. Id
 
 
 [32]
 Motion for Reconsideration, Modification of Decision and Order and Stay, reprinted in J.A. 326-28
 
 
 [33]
 Order Dismissing Complaint, reprinted in J.A. 332-33
 
 
 [34]
 See Allied Chemical & Alkali Workers, Local No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 171-72, 92 S.Ct. 383, 393-94, 30 L.Ed.2d 341 (1971); NLRB v. Hearst Publications, Inc., 322 U.S. 111, 134, 64 S.Ct. 851, 862, 88 L.Ed. 1170 (1944)
 
 
 [35]
 E.g., Local No. 627, Int'l Union of Operating Engineers v. NLRB, 595 F.2d 844, 848 (D.C.Cir.1979)
 
 
 [36]
 318 U.S. 80, 94-95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943); see also SEC v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)
 
 
 [37]
 Prill, 755 F.2d at 947-48; see Chenery, 318 U.S. at 94-95, 63 S.Ct. at 462-63; Planned Parenthood Federation of America, Inc. v. Heckler, 712 F.2d 650, 666 (D.C.Cir.1983) (Bork, J., concurring in part and dissenting in part). See generally Friendly, Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders, 1969 DUKE L.J. 199. We express no view on whether the Board might adopt something like a disparity-of-interest standard under Sec. 9 in the exercise of its discretion
 
 
 [38]
 St. Francis II, 271 N.L.R.B. at 950
 
 
 [39]
 --- U.S. ----, 106 S.Ct. 1591, 89 L.Ed.2d 841 (1986)
 
 
 [40]
 Id. 106 S.Ct. at 1598-99; see also Beth Israel Hosp. v. NLRB, 437 U.S. 483, 497-500, 98 S.Ct. 2463, 2471-73, 57 L.Ed.2d 370 (1978); Center for Auto Safety v. Peck, 751 F.2d 1336, 1351 (D.C.Cir.1985)
 
 
 [41]
 See note 15 supra
 
 
 [42]
 Cf. International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 813-14 (D.C.Cir.1983) (agency rescission of long-standing policy is arbitrary and capricious when agency relies on factors Congress has not intended it to consider); see also Oil, Chemical & Atomic Workers v. NLRB, 806 F.2d 269, 273-74 (D.C.Cir.1986) (Board must explain and justify its departure from precedent)
 
 
 [43]
 St. Francis II, 271 N.L.R.B. at 953
 
 
 [44]
 Id. at 948
 
 
 [45]
 29 U.S.C. Sec. 159 (1982)
 
 
 [46]
 See note 25 supra. A majority of circuit courts have expressly rejected the disparity-of-interest standard. See NLRB v. Walker County Medical Center, 722 F.2d 1535, 1539 n. 4 (11th Cir.1984); Trustees of the Masonic Hall & Asylum Fund v. NLRB, 699 F.2d 626, 641-42 (2d Cir.1983); Watonwan Memorial Hosp. v. NLRB, 711 F.2d 848, 850 (8th Cir.1983); NLRB v. Frederick Memorial Hosp., 691 F.2d 191, 194-95 (4th Cir.1982)
 
 
 [47]
 See Masonic Hall & Asylum Fund, 699 F.2d at 642 ("[N]othing in the statute or the legislative history requires the Board to begin its consideration of the appropriateness of a unit with a presumption in favor of wall-to-wall units. Such a test ... would unnecessarily restrict the employees' right to choose their bargaining representative.")
 
 
 [48]
 St. Francis II, 271 N.L.R.B. at 954
 
 
 [49]
 Id. at 951
 
 
 [1]
 By our reference to Extendicare, we do not necessarily approve all of the holdings of that decision[50]
 
 
 [50]
 S.REP. NO. 766, 93d Cong., 2d Sess. 5 (1974), reprinted in LEGISLATIVE HISTORY at 12; H.R.REP. NO. 1051, 93d Cong., 2d Sess. 6-7 (1974), reprinted in LEGISLATIVE HISTORY at 274-75. See St. Francis II, 271 N.L.R.B. at 951-52
 
 
 [51]
 120 CONG.REC. 22,575 (1974) (statement of Sen. Williams), reprinted in LEGISLATIVE HISTORY at 363 (emphasis added). See St. Francis II, 271 N.L.R.B. at 951
 
 
 [52]
 St. Francis II, 271 N.L.R.B. at 951
 
 
 [53]
 120 CONG.REC. 13,559-60 (1974) (statement of Sen. Taft), reprinted in LEGISLATIVE HISTORY at 255
 
 
 [54]
 St. Francis II, 271 N.L.R.B. at 951-53. We reiterate, however, that a majority of circuit courts have expressly rejected the disparity-of-interest standard. See note 46 supra
 
 
 [55]
 See note 15 supra
 
 
 [56]
 American Cyanamid Co., 131 N.L.R.B. 909, 911 (1961); see Otis Hosp., 219 N.L.R.B. 164, 165 (1975) (emphasis given to particular community-of-interest criteria may vary because "not all health care institutions may be exactly alike")
 
 
 [57]
 NLRA Sec. 9(b), 29 U.S.C. Sec. 159(b) (1982)
 
 
 [58]
 S. 2292, 93d Cong., 1st Sess. (1973), reprinted in LEGISLATIVE HISTORY at 457-58. Serious opposition developed on this point from organized labor. Union representatives argued that legislative restrictions addressed solely to the health-care industry were unnecessary and that issues of unit proliferation should be left to agency decisionmaking. See Coverage of Nonprofit Hospitals Under National Labor Relations Act, 1973: Hearings Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 93d Cong., 1st Sess. 60 (1973) (testimony of Dr. Joseph Sergent, President, Physicians Union Local No. 682); id. at 284-86 (statement of Elliott Godoff, Vice President, Drug & Hospital Workers Union Local No. 1199); id. at 562, 564-65 (testimony of Andrew Biemiller, Director of Legislation, AFL-CIO). The cap on units also apparently did not have the support of the Administration. See id. at 427, 434 (testimony of Under Secretary of Labor Richard Schubert). In any event, the determinative fact is that the proposal was withdrawn. No reference to bargaining units in the nonprofit health-care industry found its way into the law
 
 
 [59]
 Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974)
 
 
 [60]
 See note 12 supra
 
 
 [61]
 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978)
 
 
 [62]
 Id. at 496-500, 98 S.Ct. at 2471-73
 
 
 [63]
 Id. at 497, 98 S.Ct. at 2471
 
 
 [64]
 See Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 327, 24 L.Ed.2d 345 (1969) (courts should resolve any ambiguity in favor of administrative construction existing at time statute was amended "if such construction enhances the general purposes and policies underlying the legislation"); Ward v. Commissioner, 784 F.2d 1424, 1430 (9th Cir.1986) (Congress approves well-established agency interpretations of a statute when it reenacts the statute unchanged); see also note 42 supra
 
 
 [65]
 While we express no view on whether the Board might switch to a disparity-of-interest standard in the exercise of its discretion under section 9, we do emphasize that the Board would have to explain its action adequately, particularly because the Board has always construed section 9 to embody community-of-interest criteria. See International Ladies' Garment Workers' Union v. Donovan, 722 F.2d 795, 813-15 (D.C.Cir.1983) (courts must closely scrutinize agency switch from a "settled course of behavior"); accord Oil, Chemical & Atomic Workers Union v. NLRB, 806 F.2d 269, 273-74 (D.C.Cir.1986)
 
 
 [66]
 See note 13 supra
 
 
 [67]
 United States v. American College of Physicians, --- U.S. ----, 106 S.Ct. 1591, 1598-99, 89 L.Ed.2d 841 (1986); see SEC v. Sloan, 436 U.S. 103, 121, 98 S.Ct. 1702, 1713, 56 L.Ed.2d 148 (1978); Center for Auto Safety v. Peck, 751 F.2d 1336, 1351 (D.C.Cir.1985); Mary Thompson Hosp. v. NLRB, 621 F.2d 858, 864 (7th Cir.1980) (Fairchild, J., dissenting)
 
 
 [68]
 785 F.2d 1043 (D.C.Cir.), cert. granted, --- U.S. ----, 107 S.Ct. 666, 93 L.Ed.2d 718 (1986)
 
 
 [69]
 Id. at 1054 n. 11
 
 
 [70]
 See also Peck, 751 F.2d at 1351 ("[I]t is absurd--indeed, lawless--to give legal effect to ... expressions [of Congress] that purport to relate, not to the meaning of the statute, but to the manner in which a legally unconstrained agent of the Executive will behave under it.")
 
 
 [71]
 S.REP NO. 766, 93d Cong., 2d Sess. 45, U.S.Code Cong. & Admin.News 1974, p. 3958, reprinted in LEGISLATIVE HISTORY at 52 (emphasis added)
 
 
 [72]
 120 CONG.REC. 22,575 (1974) (statement of Sen. Williams), reprinted in LEGISLATIVE HISTORY at 363
 
 
 [73]
 Id
 
 
 [74]
 120 CONG.REC. 12,944, 13,559-60 (1974) (statement of Sen. Taft), reprinted in LEGISLATIVE HISTORY at 114, 255; see Part II.A. supra
 
 
 [75]
 120 CONG.REC 22,575 (1974) (statement of Sen. Williams), reprinted in LEGISLATIVE HISTORY at 363; 120 CONG.REC. 22,948 (1974) (statement of Rep. Thompson); 120 CONG.REC. 22,949 (statement of Rep. Ashbrook), reprinted in LEGISLATIVE HISTORY at 411
 
 
 [76]
 Four Seasons Nursing Center, 208 N.L.R.B. 403 (1974), involved a unit of maintenance workers at a 143-employee nursing home. The Board rejected the election petition on the ground that the maintenance workers shared common interests with the other employees and did not possess any special skills and training. In Woodland Park Hospital, 205 N.L.R.B. 888 (1973), the Board rejected the election petition for a unit of x-ray technicians in a proprietary hospital, relying on the functional integration of the x-ray technicians with the other technical employees. Id. at 889. Extendicare of West Virginia, 203 N.L.R.B. 1232 (1973), involved petitions for three separate units in a proprietary hospital--LPNs, technical employees, and service and maintenance employees. The Board found two separate units appropriate--a combined technical and service and maintenance unit and a LPN unit. Although it ruled that the technical and service and maintenance employees shared a substantial community of interests, the Board found that the LPN's had a community of interests distinct from that of the other employees. Id. at 1232-33
 
 
 [77]
 See Trustees of the Masonic & Asylum Fund v. NLRB, 699 F.2d 626, 642 (2d Cir.1983) ("[N]othing in the statute or the legislative history requires the Board to begin its consideration of the appropriateness of a unit with a presumption in favor of wall-to-wall units. Such a test ... would unnecessarily restrict the employees' right to choose their bargaining representative."); accord NLRB v. Walker County Medical Center, 722 F.2d 1535, 1539 n. 4 (11th Cir.1984); Watonwan Memorial Hosp. v. NLRB, 711 F.2d 848, 850 (8th Cir.1983); NLRB v. Frederick Memorial Hosp., 691 F.2d 191, 194-95 (4th Cir.1982)
 
 
 [78]
 See Part II.B. supra
 
 
 [79]
 See note 15 supra. While we recognize that in 1982 the Board adopted a two-tier approach in St. Francis I, we note that this approach still involved the application of traditional unit principles. See St. Francis I, 265 N.L.R.B. at 1029
 
 
 [80]
 Frazier v. Merit Sys. Protection Bd., 672 F.2d 150, 162 (D.C.Cir.1982) (quoting Power Reactor Dev. Co. v. International Union of Elec., Radio & Machine Workers, 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961)); accord General Accounting Office v. General Accounting Office Personnel Appeals Bd., 698 F.2d 516, 528 (D.C.Cir.1983)
 
 
 [81]
 Compare Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984) (courts must reject statutory constructions by agencies that conflict with "clear congressional intent") with Office of Consumers' Counsel v. FERC, 783 F.2d 206, 218 (D.C.Cir.1986) (courts must defer to statutory constructions by agencies that "fall[ ] within the permissible range of interpretations"). See also note 64 supra
 
 
 [82]
 See, e.g., Shriners Hosps. for Crippled Children, 217 N.L.R.B. 806, 808 (1975) (the 1974 Amendments "neither foreclosed nor mandated continued adherence to traditional unit determinations"); see note 65 supra
 
 
 [83]
 See notes 65 & 68 supra
 
 
 [84]
 Massachusetts Trustees v. United States, 377 U.S. 235, 248, 84 S.Ct. 1236, 1245, 12 L.Ed.2d 268 (1964)
 
 
 [85]
 St. Francis I, 265 N.L.R.B. at 1033-34
 
 
 [86]
 See notes 15, 25 & 77 supra
 
 
 [87]
 Prill, 755 F.2d at 956-57
 
 
 [88]
 NLRA Sec. 9(b), 29 U.S.C. Sec. 159(b) (1982)