Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 16, 2009                Decided June 5, 2009

No. 08-1117

NATIONAL ASSOCIATION OF BROADCASTERS,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,
RESPONDENTS

PROMETHEUS RADIO PROJECT,
INTERVENOR

———

On Petition for Review of an Order
of the Federal Communications Commission

———

*Jack N. Goodman* argued the cause for petitioner.  With him on the briefs were *Samir C. Jain*, *Dileep S. Srihari*, *Marsha J. MacBride*, *Jane E. Mago*, *Jerianne Timmerman*, and *Ann West Bobeck*.

*C. Grey Pash, Jr.*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Matthew L. Berry*, General Counsel, and *Jacob M. Lewis* and *Daniel M. Armstrong*, Associate General Counsel. *Nickolai G. Levin*, *Robert B. Nicholson*, and *Robert J. Wiggers*, Attorneys, entered appearances.

*Andrew J. Schwartzman* and *Parul P. Desai* were on the brief for intervenor in support of respondent.

Before: ROGERS, GARLAND and BROWN, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: As part of its continuing effort to promote low power FM ("LPFM") radio service, the Federal Communications Commission in 2007 amended its LPFM rules, including announcing standards for waivers of certain protections against interference with full-power FM stations. *Creation of a Low Power Radio Service, Third Report and Order and Second Further Notice of Proposed Rulemaking*, 22 F.C.C. Rcd. 21,912 (Dec. 11, 2007) ("2007 Order"). In so doing, the Commission purported not to harm the interests of full-power FM stations or other Commission licensees. *Id.* at 21,913 ¶ 1. The National Association of Broadcasters ("NAB") petitions for review of three changes, each of which it contends either reduced the protections afforded to full-power FM stations against signal interference from LPFM stations or gave LPFM stations primary status over full-power FM stations in particular circumstances. In adopting these changes, the NAB contends, the Commission violated the Radio Broadcasting Preservation Act of 2000, Pub. L. No. 106-553, § 632, 114 Stat. 2762, 2762A-111 (2000) ("the Preservation Act"), and the Administrative Procedure Act, 5 U.S.C. § 551 et seq. ("APA"). We hold that the Preservation Act did not bar the Commission

from reducing or eliminating interference protections other than third-adjacent channel minimum distance separation requirements, and that the NAB's challenges under the APA are either unripe or unpersuasive. Accordingly, we deny the petition in part and dismiss it in part.

**I**.

In January 2000, the Commission adopted rules authorizing LPFM radio service in order to "provide opportunities for new voices to be heard." *See Creation of Low Power Radio Service, Report and Order*, 15 F.C.C. Rcd. 2,205, 2,206 ¶ 1 (Jan. 27, 2000) ("2000 Order"). The LPFM stations were to be "operated on a noncommercial educational basis," *id.*, with a maximum of 10 or 100 watts of power, compared to full-power stations that operate with minimum power of 6,000 to 100,000 watts. To prevent interference between LPFM stations and full-power stations near each other on the FM dial, minimum distance requirements were established for co-channel and first- and second-adjacent channel LPFM stations but not for third-adjacent channels. *Id.* at 2,206-07; *see also* 47 C.F.R. § 73.807 (2007).[1] The Commission found that third-adjacent channel LPFM stations would not cause "significant new interference to the service of existing FM stations," and that "any small amount of interference that may occur in individual cases would be outweighed by the benefits of new low power FM stations." 2000 Order at 2,246 ¶ 104. The Commission imposed minimum distance requirements for second-adjacent channels because it

---

[1] Because interference is a function of both placement on the FM radio band and geographic distance, the geographic distance separation requirements are strictest for radio stations on the same channel (co-channels) and progressively weaker for stations that are one (first-adjacent), two (second-adjacent), or three (third-adjacent) channels apart. *See* 47 C.F.R. § 73.207.

concluded "that the risk of interference from LPFM signals . . . may be somewhat higher" than the risk from third-adjacent channels. *Id.* The Commission also required any LPFM station causing actual interference to a subsequently authorized new or modified full-power station to modify its facilities and to cease operations if modifications could not prevent interference. *Id.* at 2,231-32; *see also* 47 C.F.R § 73.809. On reconsideration it established complaint and license modification procedures designed to expedite the resolution of problems associated with "any unexpected, significant 3rd adjacent channel interference problems" caused by an LPFM station. *Creation of Low Power Radio Service, Memorandum Opinion and Order on Reconsideration*, 15 F.C.C. Rcd. 19,208, 19,210 ¶ 4 (Sept. 28, 2000); *see also* 47 C.F.R. § 73.810.

On December 21, 2000, Congress enacted the Preservation Act, which did three things of relevance to this appeal. Section 632(a)(1)(A) directed the Commission to amend the LPFM rules to "prescribe minimum distance separations for *third*-adjacent channels (as well as for co-channels and first- and second-adjacent channels)" (emphasis added). Section 632(a)(2)(A) barred the Commission from "eliminat[ing] or reduc[ing] the minimum distance separations for *third*-adjacent channels required by paragraph (1)(A)" (emphasis added). And, § 632(b)(1) and (b)(2) required the Commission to engage an independent testing entity to study whether harmful interference would result if LPFM stations were not subject to *third*-adjacent channel minimum distance separation requirements, and to file a report with Congress. The Commission amended the LPFM rules accordingly in 2001, *Creation of a Low Power Radio Service*, *Second Report and Order*, 16 F.C.C. Rcd. 8,026 (Apr. 2, 2001), and forwarded the independent study to Congress in 2004, with a recommendation that Congress "modify the statute to eliminate the third-adjacent channel distance separation requirements for LPFM stations," FEDERAL COMMUNICATIONS

COMMISSION, REPORT TO THE CONGRESS ON THE LOW POWER
INTERFERENCE TESTING PROGRAM, PUB. L. NO. 106-553 (2004).
To date, Congress has not acted on that recommendation.

In December 2007, the Commission amended the LPFM
rules, pointing to "considerably" changed circumstances arising
from both "the January 2007 lifting of the freeze on the filing of
FM community of license modification proposals, and the
implementation of streamlined licensing procedures [that]
resulted in a one-time flurry of filing activity . . . ." 2007 Order
at 21,938 ¶ 63. The amendments were designed to minimize the
loss of LPFM stations and increase the number of LPFM
stations on the air without causing interference to existing  full-
power service. The Commission explained that over the seven
years since it had established the LPFM service, the service had
"flourished for the most part," but had also "encountered unique
obstacles." *Id.* at 21,917 ¶ 10. Only approximately one third of
LPFM applications had been granted and although 809 stations
were operating at the time of the 2007 Order, 17 station licenses
and 95 construction permits had been cancelled due to
noncompliance with technical or procedural requirements. *Id.*

The NAB challenges three provisions of the amended rules,
the first two involving second-adjacent channel protections, the
third involving displacement protection for LPFM stations:

(1) The <u>modification of the cease-operations requirement</u>
in 47 C.F.R. § 73.809, where an LPFM station is causing
interference to a subsequently authorized new or modified
full-power FM station, to apply only to co-channels and
first-adjacent channels, not second-adjacent channels. *Id.*
at 21,938 ¶ 63.

(2) The interim standards for <u>waiving minimum distance</u>
<u>requirements</u> where a subsequently authorized new or

modified full-power FM station would be short-spaced to the LPFM station and thus cause the LPFM station to be displaced where an alternate, fully-spaced and rule-compliant channel was unavailable to the LPFM station. *Id.* at 21,939-40 ¶¶ 66-67.

(3) A <u>rebuttable non-binding presumption favoring LPFM stations</u> deemed to be appropriate by the Commission because "the public interest would be better served by a waiver of the Commission Rule making LPFM stations secondary to subsequently authorized full-[power FM] stations and the dismissal of an 'encroaching' community of license reallotment application when the threatened LPFM station can demonstrate it has regularly provided at least eight hours per day of locally originated programming." *Id.* at 21,940-41 ¶¶ 68-69.

The Commission invited comment on whether to codify the second and third changes. *Id.* at 21,942-46.

## II.

The NAB challenges the Commission's statutory interpretation and also raises objections under the APA. Upon reviewing an agency's interpretation of a statute it administers, the court applies the familiar two-step analysis of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837 (1984). Under step one, where a statute "has directly spoken to the precise question at issue," *id.* at 842, the court and the agency "must give effect to the unambiguously expressed intent of Congress," *id.* at 843. Under step two, when the statute is silent or ambiguous regarding the specific question, the court asks "whether the agency's answer is based on a permissible construction of the statute." *Id.* Regarding the APA challenges, the court will reverse only if the agency's action is arbitrary or

capricious or manifestly contrary to the statute. *See FCC v. Fox Television Stations, Inc.*, No. 07-582, slip op. at 9-12 (U.S. Apr. 28, 2009); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). We conclude that the NAB has read into the Preservation Act words Congress did not enact and that its efforts to avoid the plain text are unavailing, and further that its APA challenges are unpersuasive or unripe.

**A.**

Section 632(a)(1)(A) of the Preservation Act requires the Commission to "prescribe minimum distance separation for third-adjacent channels (as well as for co-channels and first- and second-adjacent channels)." By contrast, § 632(a)(2)(A) bars the Commission from "eliminat[ing] or reduc[ing] the minimum distance separations for third-adjacent channels required by paragraph 1(A)" but makes no reference to other channels. The cross-reference to § 632(a)(1)(A) is tied explicitly to "the minimum distance separations for third-adjacent channels." By their clear text, § 632(a)(1) and (a)(2) are not opposite sides of the same coin, requiring minimum distance separations for all four categories and then banning elimination or reduction of those. In § 632(a)(1)(A), Congress acknowledged the four categories of minimum distance separations employed by the Commission. In § 632(a)(2)(A), Congress restricted the Commission's authority to eliminate or reduce those separations in only one category, third-adjacent channels. Under the general presumption that an omission is intentional where Congress has referred to something in one subsection but not in another, *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452-54 (2002), the fact that § 632(a)(1)(A) mentions all four categories but § 632(a)(2)(A) mentions only third-adjacent channels further indicates that § 632(a)(2)(A) restricts the Commission's authority only with respect to that category. The NAB's reliance on the discussion of superfluity in statutory

interpretation in *Entergy Corp. v. Riverkeeper, Inc.*, No. 07-588, slip op. at 8 (U.S. Apr. 1, 2009), and *Corley v. United States*, No. 07-10441, slip. op. at 9-12 (U.S. Apr. 6, 2009), is misplaced. Reading the Preservation Act in accord with its plain text does not render § 632(a)(1)(A) superfluous because that provision requires the Commission to establish third-adjacent channel minimum distance separation requirements and acknowledges that the Commission has already imposed minimum distance requirements for the other channels. On the other hand, reading § 632(a)(1)(A) to prohibit the Commission from limiting interference protections would render § 632(a)(2)(A) super-fluous. The statute should be read in a manner that gives effect to all of its provisions. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004).

The context in which Congress acted supports reading the Preservation Act in a manner consistent with its plain text. The NAB suggests "it would make no sense to conclude that Congress meant to prohibit the [Commission] *only* from eliminating third-adjacent protections, while leaving the Commission free to reduce interference protections from channels closer on the 'dial' that would cause even *greater* interference." Petr's Br. at 21. However, as the Commission points out, the "issue pressing Congress at the time" was the absence of third-adjacent channel minimum distance separation requirements. *See* Respt's Br. at 24. Confirming that § 632(a)(2)(A) focused on the third-adjacent channel, Congress directed the Commission in subsection (b) to engage an independent testing entity to study third-adjacent channel interference. Having prescribed a course of action for the Commission with regard to the third-adjacent channel, Congress's silence in § 632(a)(2)(A) as to other channels indicates no other restrictions were placed on the Commission's authority in regulating LPFM stations.

The NAB's evidence that Congress had a broader purpose is, at best, of minimal persuasive force because "'courts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'" *Shannon v. United States*, 512 U.S. 573, 583-84 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB*, 814 F.2d 697, 712 ( D.C. Cir. 1987)) (emphasis deleted and alterations made in *Shannon*). The NAB points to statements in the House Commerce Committee Report, *see* H.R. REP. NO. 106-567, at 8 (2000), and several statements by Members on the House floor that the legislation was intended to require the Commission to impose protections at least as strict as were in existence on January 1, 2000. But the statutory text is narrower. For example, the Report states that "LPFM stations which are authorized under this section, but cause interference to new or modified facilities of a full-power station, would be required to modify their facilities or cease operations." *Id.* No such requirement appears in the Preservation Act, which does not address signal interference protections other than minimum distance separation. Likewise, the limitation referred to in Congressman Tauzin's statement that "the bill maintains Congressional authority over any future changes made to the interference protections that exist in the FM dial today," 146 CONG. REC. 5,611 (2000), appears nowhere in the statute.

Furthermore, not only do the statements in the Committee Report on which the NAB relies lack a "statutory reference point," *Shannon*, 512 U.S. at 584, aspects of the legislative history support reading the statute as restricting the Commission's authority only with respect to third-adjacent channels. For instance, the headings of the proposed legislation printed in the Report read "(a) Third-Adjacent Channel Protections Required," and "(b) Further Evaluation of Need for Third-Adjacent Channel Protections," H.R. REP. NO. 106-567, at 2, and the Report's discussion of the need for legislation

emphasizes the Commission's failure to provide for third-adjacent channel protections, *id.* at 4. Not only did the House Committee retreat from a bill that would have prevented the Commission from authorizing LPFM at all, *see* H.R. 3439, 106th Cong. (1999), floor statements indicate that the bill passed by the House was a "true compromise" and "allows for the [Commission] to proceed with plans to implement a low-power FM radio service to address the community needs of many localities," 146 CONG. REC. at 5,611 (statement of Rep. Tauzin); *see id.* at 5,614 (statement of Rep. Pallone) (the compromise "allows the [Commission] to move forward with the low-power FM as long as it protects existing third-channel interference protections"); *id.* at 5,612-13 (statement of Rep. Oxley). These statements are consistent with the conclusion reflected in the plain text that Congress did not intend to restrain the Commission's authority to respond to new circumstances potentially threatening LPFM stations other than with respect to third-adjacent channel minimum separation requirements.

In a further attempt to avoid the plain text, the NAB maintains it produces absurd results. *See Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088-89 (D.C. Cir. 1996). In the NAB's view, "Congress understood that the [Commission] would have to peel back the outermost layer of protections before reaching the inner layers, and the [Act]'s protection of the outer layer thus protected the whole." Petr's Br. at 23. Seemingly intuitive, this assertion is unsupported by the statutory text. Even assuming the logic behind relaxing requirements for third-adjacent channels before those for first- or second-adjacent channels, the NAB has not shown that the former must precede the latter. Although entirely eliminating the requirements for second-adjacent channels while retaining the requirements for third-adjacent channels might fail the arbitrary and capricious test, that is not what the Commission has done. Rather, the Commission has simply announced limited circumstances in

which it will waive the second-adjacent requirements. Having addressed only the minimum distance requirements for third-adjacent channels, Congress did not implicitly restrict the Commission's authority with regard to the separate but related issue of second-adjacent channel requirements.

In sum, Congress spoke directly to third-adjacent channel minimum distance separation protections but was silent regarding the Commission's authority to reduce or eliminate protections for other channels. Moreover, the modification of the cease-operations requirement and the announcement of a presumption favoring waiver of secondary status do not concern minimum distance-separation requirements, and thus are not covered by the text of the statute at all. The limited nature of Congress's direction is unsurprising because the Commission had already imposed protections on the other channels. Other than acknowledging those existing protections, Congress left undisturbed the Commission's authority to adopt regulations, including ones to modify the second-adjacent channel distance protection in Section 73.809 of its rules, to set standards for waiving second-adjacent channel minimum distance requirements in Section 73.807, or to set standards for determining whether an LPFM station should be accorded primary status over an encroaching full-power station. Because Congress did not address the subjects that are the focus of the NAB's challenges, the Commission's interpretation of the Preservation Act as limiting its authority only with respect to third-adjacent channel minimum distance requirements reflects the plain text and the context in which Congress acted, and is neither "demonstrably at odds with the intentions of its drafters," *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (quoting *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1982)), nor "contrary to common sense," *id.*

12

**B.**

The NAB's challenges on APA grounds range from broad assertions of arbitrariness to more technical objections. While of varying force, none demonstrate, at least at this point, that the NAB's petition should be granted. Although the Commission maintains the NAB's contentions regarding the interim waiver policies are not ripe, *see Abbot Labs. v. Gardner*, 387 U.S. 136, 147 (1967); *Natural Res. Def. Council v. EPA*, No. 07-1151 (D.C. Cir. Mar. 20, 2009); *AT&T Corp. v. FCC*, 349 F.3d 692, 699-700 (D.C. Cir. 2003), whether the Commission violated the APA's notice and comment requirement in announcing waiver standards and the requirement that it provide an adequate explanation for its actions are questions of law where factual development would not aid review. *See Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 92-93 (D.C. Cir. 1986). Accordingly, these challenges are ripe, *see Sabre, Inc. v. Dep't of Transp.*, 429 F.3d 1113, 1119 (D.C. Cir. 2005); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002), although some of the NAB's other challenges are unripe. The challenges that are ripe lack merit.

1. As regards the Commission's weakening of second-adjacent channel interference protections under Sections 73.807 and 73.809, the NAB asserts that a "single unsupported sentence" is the totality of the Commission's reasoning and fails to satisfy the APA's requirement that the Commission provide a reasoned explanation for the change. Petr's Br. at 16. In that sentence, the Commission stated: "Based on desired-to-undesired ("D/U") signal strength ratio calculations, in most circumstances interference would be predicted to extend from ten to two hundred meters from the LPFM station antenna." 2007 Order at 21,939 ¶ 65. However, this sentence was only part of the Commission's reasoned and adequate explanation for the change in its approach to second-adjacent channel protections. *See FCC v. Fox Television Stations, Inc.*, No. 07-

582, slip op. at 10 (U.S. Apr. 28, 2009); *Motor Vehicle Mfrs. Ass'n*, 453 U.S. at 42-43.

In the 2007 Order, the Commission described the changed circumstances that prompted it to "adjust[] the balance of the competing priorities of interference protection and preserving existing service." Respt's Br. at 41; *see* 2007 Order at 21,913. The Commission explained that its staff had identified approximately 40 LPFM stations that could be forced to cease operations under Section 73.809 because of increases in full-power FM station modification applications. To minimize displacement threats from the increasing number of encroaching full-power FM stations while minimizing the impact on full-power stations, the Commission limited the reach of Section 73.809 to co-channels and first-adjacent channels but retained the second-adjacent channel minimum distance requirement for allotting LPFM stations in the first instance contained in Section 73.807. The Commission also explained that any interference to full-power stations would be minimal because "second-adjacent channel interference to a full service station is generally predicted to occur only in the immediate vicinity of the LPFM station transmitter site," and the stations could implement "various techniques" to "substantially reduce[]" predicted interference, 2007 Order at 21,938 ¶ 63, noting that such techniques had already been successfully employed, *see id.* at ¶ 62.

The Commission's discussion of the changed circumstances and minimal predicted interference satisfy the APA's requirement that an agency justify a reversal in course. As the Supreme Court recently cautioned in *Fox Television Stations*, there is "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review" than when an agency adopts a policy in the first instance. *FCC v. Fox Television Stations, Inc.*, No.

07-582, slip op. at 10 (U.S. Apr. 28, 2009). The extent of the Commission's explanation distinguishes this case from *American Radio League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008), where the Commission summarily dismissed empirical data submitted at its invitation. Moreover, the quoted observation about predicted interference on which the NAB focuses is, as the Commission points out, not cryptic because "the concept of desired-to-undesired signals is basic to making these sorts of potential interference determinations and is spelled out in Commission rules for addressing 'short-spaced' situations." Respt's Br. at 34 (citing 47 C.F.R. § 73.215).

2. The NAB challenges the Commission's interference finding on the ground that it is untethered to record evidence. But the Commission's statement about predicted interference from second-adjacent channel LPFM stations is consistent with its conclusion in 2000. Then the Commission concluded, upon considering technical studies submitted by a number of commenters including the NAB, that the risk of interference from LPFM signals on second-adjacent channels "may be somewhat higher" than the "small amount of interference that may occur" from signals on third-adjacent channels. 2000 Order at 2,246 ¶ 104. Likewise, in 2005, the Commission stated that "it would be useful to consider whether to limit the Section 73.809 interference procedures to situations involving co- and first-adjacent channel predicted interference, where the predicted interference areas are substantially greater than for second- and third-adjacent channel interference." 2005 Further Notice at 6,780 ¶ 38. In the 2007 Order, the Commission concluded that "in most circumstances interference would be predicted to extend from ten to two hundred meters from the LPFM station antenna." 2007 Order at 21,939 ¶ 65. This statement reflects that the Commission's engineering judgment did not change, but rather the Commission reevaluated the

competing priorities of interference protection and preserving existing service in the face of changed circumstances.

Moreover, one aspect of the NAB's challenge is unripe. In connection with the waiver standards, the Commission made the interference prediction in the context of suggesting that "[c]learly it will be advantageous to an LPFM applicant's waiver showing to propose modifications that minimize the area of predicted interference." 2007 Order at 21,939 ¶ 65. It is as of yet unclear whether and how the stated interference prediction will affect the Commission's consideration of a particular waiver request and such a fact-bound inquiry is best assessed in a concrete setting. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732 (1998). Hardship is minimal at best because NAB's members may assert a particular claim of harm when a waiver is sought, s*ee AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003), and the Commission's final action on waiver requests is not to occur until it completes the rulemaking begun in the 2007 Order.

3. The NAB also contends the Commission's adoption of the waiver policies violates the APA notice-and-comment requirement. (The NAB conceded at oral argument that notice-and-comment procedures are not required to establish the Commission's rebuttable presumption favoring waiver of secondary status, as our precedent makes clear, *see Pandhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1110 (D.C. Cir. 1987).) The APA exempts from its notice-and-comment requirement "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A); *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006). In determining whether an agency has issued a statement of policy rather than a binding rule subject to notice-and-comment, the court looks to the effects of

the agency's action, asking whether the agency has imposed any rights and obligations or has left itself free to exercise discretion, taking into account the agency's phrasing, *Ctr. for Auto Safety*, 452 F.3d at 806. The court further considers: "(1) the [a]gency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency," *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999). *See Ctr. for Auto Safety*, 452 F.3d at 806-07.

Here, the Commission characterized its announcement as a "clarification," 2007 Order at 21,939 ¶ 64, of its waiver standards while expressly "le[aving] itself free to exercise discretion," *Center for Auto Safety*, 452 F.3d at 806. The standards are generalized and only take effect once the Commission, or the Media Bureau, determines that a waiver is in the public interest; therefore, they do not yet have a binding effect on private parties and they do not bind the Commission to a particular result in any case. The standards also were not published in the Code of Federal Regulations, and the Commission will not take final action on waiver requests until the rulemaking begun in the 2007 Order is completed. The NAB's citations to cases defining waiver as a tool to be used in narrow circumstances neither speak to the APA notice-and-comment question nor cast doubt upon the Commission's waiver standards, which address individualized cases and specify prerequisites for granting a waiver as well as factors the Commission will consider. *See* 2007 Order at 21,940 ¶ 67, 21,941 ¶ 69. So understood the policy "genuinely leaves the agency . . . free to exercise discretion." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 942, 946 (D.C. Cir. 1987). The Commission's announcement of waiver standards thus falls within the APA exception for general statements of policy.

The NAB persists that although an agency typically may promulgate *de minimus* exemptions to statutes it administers, *see Shays v. FEC*, 414 F.3d 76, 113-14 (D.C. Cir. 2005), the Commission could not view, and has not viewed, second-adjacent protections as *de minimus*. However, the Commission has authority under its rules, *see* 47 C.F.R. § 1.3, to waive requirements not mandated by statute where strict compliance would not be in the public interest, so long as it articulates identifiable standards for exercising that authority. *See NetworkIP, LLC v. FCC*, 548 F.3d 116, 127 (D.C. Cir. 2008); *Ne. Cellular Tel. Co. v. FCC*, 897 F.2d 1164, 1166 (D.C. Cir. 1990); *WAIT Radio v. FCC,* 418 F.3d 1153, 1159 (D.C. Cir. 1969). In announcing the waiver standards, the Commission satisfied those conditions. The interim minimum distance waiver policy is to apply only where implementation of a new or modified full-power station would result in the full-power and LPFM stations operating at less than the required minimum distance separation and there is no alternate, fully-spaced, rule-complaint channel available to the LPFM station. 2007 Order at 12,939-40, ¶¶ 65-67. Where the LPFM station has been regularly providing eight hours of daily locally originated programming, the Commission will apply a rebuttable presumption that the public interest favors the LPFM station over granting the full-power station's modification application, *id.* at 21,940 ¶ 68, and the Commission retained discretion to deny a waiver request in any event, *id.* at 21,941 ¶ 69.

4. Finally, the NAB's contention that the presumption in favor of LPFM weakens protections for full-power stations is unavailing given the narrow scope of the Preservation Act's restriction on the Commission's authority. Furthermore, the NAB's interpretation of the presumption's effect — that second-adjacent channel protection no longer exists — ignores the six factors that a full-power station may contest, 2007 Order at 21,941 ¶ 69, the rebuttable nature of the presumption, and the

Commission's retention of discretion to deny a waiver request even where the LPFM station has made the required showing. The Commission stated it intended to limit the presumption to those LPFM stations that have "regularly provided at least eight hours per day of locally originated programming," 2007 Order at 21,940 ¶ 68, and not to apply it where a full-power facility proposes to improve service to the community covered by its license. *Id.* at 21,941 ¶¶ 69-70. In suggesting that the secondary stature of LPFM stations under the new presumption violates the APA because the presumption is based on an unsupported assumption that stations that provide local programming serve the public interest, the NAB overlooks that the presumption reflects the Commission's view that locally originated programming is a primary benefit of the LPFM service. *See id.* at 21,922 ¶ 24. And, contrary to the NAB's suggestion, the presumption appears not to implicate the Commission's consideration of programming content as the Commission's reference to "locally originating programming," *id.* at 21,940 ¶ 68, refers under its rules to the geographic location of the production of programming, *see* 47 C.F.R. § 73.872(b)(3), not the substantive content of the programs. As there is no clear indication that the Commission will regulate content in applying the presumption, the challenge based on the Commission's regulation of content is unripe.

Accordingly, we deny the petition in part and dismiss the petition in part.